WILLIAM HICKS, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. Where there is conflicting evidence in a case it is the duty of the jury, if they can, to reconcile the conflict, but if they cannot do so, it is their duty to discard any evidence they do not believe, and to render their verdict upon the evidence they may believe to be true.

2. The verdict of a jury will not be set aside upon the ground that it is against the weight of evidence unless the preponderance is such

536 SUPREME COURT.

Hicks vs. State of Florida—Opinion of Court.

that it must have been produced by considerations other than a due respect to the evidence.

3. Malice, and the premeditation necessary to be proved to show murder in the first d-gree, may be legitimately inferred by the jury, as a question of fact, from the circumstances of the case.

4. An application for a continuance is always addressed to the sound discretion of the court, and such discretion will not be controlled by the appellate court, unless it appears that the court below abused its authority, whereby the rights of the party may have been jeopardized.

5. Where a party is on trial charged with murder in the first degree, it is the duty of the court to charge the jury as to the different degrees or grades of homicide applicable to the evidence in the case, but it is not the duty of the court to charge upon a degree of homicide to which the evidence of the case does not apply.

6. It is not error, even in a capital case, for the jury to embody in their verdict a recommendation to the mercy of the court.

Writ of Error to the Circuit Court for Escambia county.

The facts of the case are stated in the opinion of the court.

*J. D. Thompson* for Plaintiff in Error.

*The Attorney-General* for Defendant in Error.

MITCHELL, J.: William Hicks, the plaintiff in error, was tried at the Spring Term of the Circuit Court of Escambia county, 1888, for the murder of Joseph McMillan, and was convicted of murder in the first degree, with a recommendation to the mercy of the court by the jury.

A motion for new trial was made, but the motion was overruled, and the court sentenced the defendant to imprisonment in the State penitentiary for the term of his natural life, and the case is before this court upon writ of error from the order of the court overruling such motion.

The errors assigned are:

1. That the verdict of the jury is contrary to law;

2. That the verdict is contrary to the evidence, and against the weight of the evidence;

3. The court erred in refusing a continuance on defendant's application;

4. The court erred in the second paragraph of its charge to the jury;

5. The court failed to charge the jury as to the relative degrees of manslaughter;

6. The court erred in its last charge to the jury, that is to say, the 11th paragraph;

7. The recommendation to mercy was part and parcel of the verdict.

There is nothing in the first error assigned. We cannot see wherein the verdict was contrary to law.

As to the second assignment:

The evidence sent up in the record conduces to show that there had been bad blood between the defendant and McMillan, the deceased, and that on the night of the 25th of December, 1887, there was a dance at Molino, and that the defendant and the deceased were in the vicinity where the dance was going on, and that they passed each other, each being accompanied by several friends.

The following is the substance of the evidence in the case:

O. A. Richardson, sworn for the State, says: "I know William Hicks. Knew Joe McMillan in his life time; he is dead. Saw him the night of the 25th of December last. I saw him dead on the noon of the 26th, in the public road at Molino, Escambia county, Florida. I live at Molino. I was waked up by George Beard, and went around the fence and found the dead body on the side of the road. Examined the body and found he was shot. Wound was about the size of my finger; had on overcoat and coat and vest and shirt; ball had penetrated the overcoat. I opened cloth-

ing and examined wound; clothing was scorched; very little discharge of blood; he was lying on his back; dead body was still warm; no one there when I got there; others came up afterwards. Joe McMillan lived at Pine Barren; it is north from Molino; his residence is on same side as mine. The road where the body was found led out to the main Pensacola road, and led to Pine Barren.

"Wound was just below the bone of the chest. It seemed to go straight into the body. I did not see the shooting. I judge from the appearance of the wound he was shot. Looked like a wound made by a pistol, seemed to be a 38 calibre."

Robert Roland, a witness for the State, says: We went on towards where they were having a dance, that was myself, Asa Roberts, George Beard and McMillan; dance was out towards west. We went west from the place where I met McMillan; after having gone about 200 yards we met Hicks. Hicks, Bob Broxton, Jessie Floyd and Bob McLaughlin; I mean the defendant by William Hicks. They all passed me but Bob Broxton, and he said here is Joe McM. to back Bob Roland. Joe McM. said he would back anybody from Pine Barren. Joe McM. did not stop, but went on. Joe McM. and Asa Roberts were walking in front, and I and George Beard followed on behind. They went on a little way and turned back. Hicks, Bob McL., Jesse Floyd and Bob Broxton came on behind us. After they passed us, going east, as we were going west, Hicks said, "there is Joe McMillan, the d— s— of a b—. I have been laying off to kill him for some time, and if he gets in ten feet of me to-night I'll kill him;" they were going east towards the railroad when they turned back. When they got up to us Hicks was cursing McM., he had his pistol in his hand flourishing it, and saying he was going to kill Joe McM. if he got in ten feet of him, he had been laying off to kill him; he said by G— he had been laying off to kill Joe McMillan

and if he got in ten feet of him he would kill him. Bob Broxton and I caught hold of him and advised him, Hicks, not to have any trouble with Joe, he was drinking; he kept on cursing, saying he would kill Joe. * * He still had his pistol in his hand. We were all going in the same direction. Asa Roberts was still going up the hill with McM. McM. said nothing to Hicks till he turned around. Hicks was about 4 or 5 steps of him when he turned around. Hicks had followed about 100 or 150 yards before he turned around; when McM. turned around Hicks had his pistol in his hand and said he was going to kill McM. Hicks was talking in a loud tone. When McM. turned around and placing both hands on Hicks—the lappels of his coat—and said " is that you Will Hicks?" did not see any pistol in McM.'s hand. I still had hold of Hicks; if McM. had a pistol I did not see it. When McM. turned and said, is that you Will Hicks, he did not offer any violence to Hicks. Don't know where Asa Roberts went when they clinched. When they clinched I had hold of Hicks, and Grice ran up with a knife and said turn Will Hicks loose. Hicks said keep the dogs off and I will fix him. Bob Broxton said I will keep them off. They were then on the ground. When they clinched Joe McM. went backwards, and when I looked back they were on the ground; don't know who was on top. Heard two pistol shots fired close together. When Broxton made that remark Hicks was on top. McM. asked Hicks to get off of him. Hicks got up. McM. got up and asked if he had a friend there. I replied I am your friend. He started towards me and said, Bob, I am shot through and through, and laid down. He said nothing more after he laid down, and died. I shook him and asked him if he was shot, he made no reply. When I said I was a friend to McM. Bob. Broxton was walking up and down, and said keep your mouth shut, don't know anything about this or

you will get yourself in trouble. When I said I was a friend to McM. and was going to tell Judge McM., he, Hicks, asked what McM. had to do with it, and said I have killed one son of a b——, and if you fool with me I will kill you too. Jesse Floyd was there too when Broxton said, know nothing about it. When Hicks came up to McM, and McM. turned around, Hicks had his pistol up in the air. Don't know what position Hicks had his pistol when he was on top. I saw Hicks standing by the fire place with pistol in his hand after he shot McM. I told Hudson to look around and see if he could find anything of a pistol. Witness had a lamp and looked also; no pistol was found near the dead body of McMillan. On cross-examination witness said he met Hicks about 12 or 1 o'clock on the night of the killing. That the parties got into a scuffle—got on the ground—heard two pistol shots when they were on the ground; don't know who fired them.

G. M. Gentry, for State, says: I acted as Coroner and examined the body; he was shot in the soft cavity, at the lower end of the breast bone; wound made with a 38 or 40 calibre, he was burned, and shot must have been fired at close range. Saw him last on the 25th of December. I turned him on his face and saw a place I thought to be the locality of the bullet between shoulders; it had turned dark. Bullet hole in overcoat was lower than wound in body; must have been fired ranging upwards; there was a dark place, seemed to be the settlement of blood.

F. G. Renshaw, physician and surgeon, says: I have heard the testimony of preceding witnesses. Such a wound would produce death. Wound in a similar place as described would produce death in a strong, healthy man.

Asa Roberts, a witness for the State, corroborates the evidence of Robert Roland in every material point.

Jesse Floyd, for defence, says: I and McLachlin and

Broxton went from the dance to Smith's Hall, and we went back to where they were dancing. We met Hicks. McMillan asked if that was Hicks, and shot over Broxton's shoulders, and then Hicks fired at McMillan. We had gone about 120 yards when we met Hicks. McMillan was close to Hicks, when he shot at Hicks. Hicks ran into him then, about the time they were falling Hicks shot. On cross-examination this witness says: McMillan said after Hicks had taken his pistol from him and he was on the ground, "go, you s— of a b—, I'll get you." That was after McMillan was shot.

Robert Broxton, for defence, says: Met McMillan at Smith's Hall, he asked who it was, I replied Bob Broxton. He then asked who that was ahead, and some one said Hicks is there. He stepped back and pulled out his pistol and shot over McLaughlin, putting his arms around McLaughlin's shoulders, and then Hicks shot McMillan. I don't know how far I was from them when they were tusseling on the ground. I asked McMillan if he was hurt, he said I am shot through and through. McMillan and Hicks clinched after the first shot; heard two pistol shots. McMillan fired first. Don't know whether they had any quarrel previously. On cross-examination, witness says: I did not say I'll keep the dogs off. I got out of the way.

Robert McLaughlin, for defence, says: On the 25th of December, there was a dance. I and Jesse Floyd and Bob Broxton went to Smith's Hall. McMillan asked who was that, some one said Bill Hicks, and McMillan raised his hand and fired at Hicks. Nothing material was elicited on the cross-examination.

In rebuttal, Robert Roland says: The first time that night I met Hicks was in that lane. Asa Roberts, Jesse Floyd, McLaughlin and Broxton did not go to where they were dancing. If McLaughlin asked if it was Hicks I did not

542 SUPREME COURT.

Hicks vs. State of Florida—Opinion of Court.

hear it. It is not true that McMillan fired at Hicks. There were only two shots fired, that was while they were down. Hicks did not go and take a pistol out of McMillan's hand. When McMillan got up he only said, Bob, I am shot through and through.

Asa Roberts, for State, says: McMillan and I first met Hicks on the 25th of December where I told you. McMillan did not draw his pistol and shoot at Hicks.

George Fleming, for the State, says: I was at Molino on the night of the 24th of December. I left there about two o'clock. I heard two pistol shots as quick as they could be, one after the other; heard them as I was leaving.

This is all the evidence in the case, and as to the actual facts and circumstances of the killing, the evidence is conflicting, but as to the circumstances leading up to that time there is no material conflict in the evidence. The witnesses for the State detail those circumstances which show that the defendant sought the deceased, and that by his conduct the difficulty was precipitated, and that he took the life of Mc-Millan without sufficient reason or provocation for doing so. On the other hand, the evidence for the defence is very meager, but as to the actual shooting there is a singular unanimity on the part of the witnesses who testified for the defendant, that McMillan *fired the first shot*, but in their statement as to the position of the parties at the time, as to their own opportunities for seeing what was going on, there are discrepancies which it is difficult to reconcile with their positive statements that McMillan shot first. There is nothing in their testimony, except this general statement that the deceased fired the first shot, and that one of the witnesses, Floyd, that the defendant took a pistol from the deceased after he was shot. As to what became of that pistol, if any there was, is not accounted for by the defendant, but on the other hand, almost immediately after the shooting, as

shown by the testimony for the State, a search was made to ascertain if the deceased had a pistol, none was found, and it is not shown that the defendant or his friends at the time exhibited any pistol belonging to the deceased, which, under the circumstances, casts suspicion on their testimony. But be this as it may, under an appropriate charge of the court, as to the evidence, and as to conflicting evidence, the jury found the defendant guilty, and, in our opinion, the evidence justified them in so finding. The jury had all the witnesses before them, and it may be that they knew them all, and after hearing the whole of the evidence, and after observing the manner in which the witnesses testified, and the evidence being conflicting, and it being the duty of the jury to reconcile the conflict if they could, but failing to do so, it was their duty to discard any evidence they did not believe, and to render their verdict upon the evidence they believed to be true, and having done this, and there being evidence to support the verdict, there was no error in the court refusing to grant a new trial on the ground that the verdict was against the evidence, or the weight of the evidence. The verdict of a jury should not be set aside, as against the weight of evidence, unless the preponderance is such that it must have been produced by considerations other than a due respect to the evidence; and a verdict is not against evidence when there is legal evidence to support it, though there be conflicting testimony upon material points. Huling vs. Florida Savings Bank, 19 Fla., 695 ; John D. C. vs. State *ex rel.*, 16 Fla., 554; Mayo vs. Hynote, 16 Fla., 673 ; Robinson *et al.* vs. State, 5 So. Rep., 6. As to the premeditation necessary for the State to prove, the language and conduct of the defendant were such as to warrant the jury in coming to the conclusion that the killing of McMillan was from a premeditated design to take his life. Dukes vs. State, 14 Fla., 499.

As to the fourth error assigned, the record shows that the defendant, for the purpose of a continuance, filed an affidavit stating that "Annie Castlebury is a material witness for his defense; that she resides in the county where this prosecution is pending, and a subpoena has not been taken out for her appearance because this affiant did not learn of the facts within her knowledge until Sunday, April 22, and has had no opportunity to have subpoena issued until now; that said witness is not absent by the consent of this affiant directly or indirectly given, that he expects to procure the testimony of the said witness by the next term of this court; that he expects to prove by said witness a series of threats beginning full three months and continuing down to within a few hours of the killing of said McMillan, the deceased, named in the indictment; that said threats were made by said McMillan, the deceased, from a felonious design against the life of this affiant; that said witness is material, and he cannot safely proceed to trial without it."

The State filed a counter affidavit made by O. A. Richardson, who states that the State had a subpoena issued for said witness, which was placed in his hands, as deputy sheriff, on April 12th, to be served; that he diligently searched for said witness, but could not find her; that she left this county the day before the killing of McMillan; that he lived in the same neighborhood with the said witness, and could not ascertain her whereabouts. The court overruled the motion for continuance, and the order overruling said motion is assigned as error.

In Blige vs. State, (20 Fla., 742,) the court say: "An application for a continuance of a cause is addressed to the sound discretion of the court, and ordinarily such discretion will not be interfered with by the appellate court. But when the court can see that the rights of the party may have been jeopardized, and the rule in regard to the appli-

cation has been fully complied with, and there has been no previous delay, and especially when the application is made on the very day of the finding of the indictment, this court will control such discretion." See also Denham vs. State, 22 Fla., 664.

The indictment in.the case at bar was returned into court on the 13th day of April, 1888, and the defendant was arraigned thereupon on the 18th day of the same month, the cause was set for trial on Monday, the 23d, and a special venire ordered for jurors to try the cause, and on Monday, the 23d, the day set for trial, the defendant filed motion and affidavit for continuance. The State had procured a subpœna for the witness, Annie Castlebury, on the 12th of April, and O. A. Richardson, a deputy sheriff, says that he had searched for and made enquiries as to the whereabouts of Annie; that he could not find her, but learned that she left the county the day before the killing of McMillan. McMillan was killed the 25th day of December, and from that time till the case was called for trial the witness could not be found, but at this time, and, in all probability, when it was generally known that the witness could not be found, the defendant made his application for continuance on account of the absence of this witness, and swears that he did not know till the day before he made his application for the continuance, that the witness knew of the threats alleged to have been made against his life by McMillan, the deceased, nor did he make such application until after he had been arraigned.

And now, under the circumstances, and under the rule laid down in Blige vs. State, and Denham vs. State, *supra*, did the court err in overruling the motion for continuance?

The defendant, in his affidavit, did not state where the witness was, nor as to how he obtained the information that the witness could swear to threats made against him. If he

had such information in his possession, he obtained it from some person, and by having such person to make affidavit to such fact his application for continuance would have been strengthened thereby, but he did not produce such affidavit, nor did he, so far as the record shows, give the name of the party from whom he obtained such information, and coupling these facts with the other facts as to said application for continuance, we think the motion was properly overruled.

But suppose the absent witness had been present at the trial, and suppose the defendant could prove by her what he says he " expects to prove," would the result have been different ? Suppose the witness present, and that she would swear to the facts defendant says he expected to prove by her, would the jury not be justified in finding as they did find ? We think so.

The fourth and sixth errors assigned relate to the charge of the court, which charge we have carefully examined and considered, and after doing so, we are satisfied that the charge covers the law of the case, and that it is fair and impartial in every respect.

The fifth error assigned is that the court did not charge as to the relative degrees of manslaughter. This we have also examined and failed to see the force of the objection to the charge in this respect. The Judge gave the jury our statutory definition of manslaughter in the second, third and fourth degrees, but did not give the definition of the first degree, but there was no error in not doing so, because the evidence in the case did not, in any sense, apply to manslaughter in this, the first degree.

There is nothing in the seventh error assigned. The court charged the jury that they could recommend the prisoner to the mercy of the court, if a majority of them saw proper to do so, and instructed them that such recommen-

dation would change the penalty for murder in the first degree (which, without recommendation is death) to imprisonment in the State Penitentiary for life.    In their verdict the jury recommended the prisoner to the mercy of the court, and counsel for plaintiff in error insists that the recommendation should not have been in the verdict.    There can be nothing in this alleged error.    The statute which allows such recommendation, and changes the penalty by reason thereof, does not say that the verdict shall or shall not contain the recommendation when made, but the practice is for the jury to embody the recommendation in their verdict.    It can certainly make no difference as to whether the recommendation is in the verdict or separately made.

There was no error in overruling the motion for new trial.

And now, after carefully considering the whole case, and every fact and circumstance connected with it, we are satisfied that the plaintiff in error had a fair, impartial, legal trial, and that therefore there is no cause for reversal.