Barnhill v. State.—Syllabus.

MILEY G. BARNHILL, *Plaintiff in Error,* v. THE STATE OF FLORIDA, *Defendant in Error.*

1. A fact asserted in a motion for new trial is not self-substantiative before the appellate court, but it must be authenticated otherwise in the transcript of record.

2. In a trial for murder in the first degree, an instruction upon the law of self defense should be so framed as to inform the jury that the defendant could not justify the killing unless he had reason to believe and did believe that it was necessary to save his own life or to save himself from great personal injury.

3. An instruction in a trial for murder *held* properly refused because it failed to hypothesize defendant's imminent danger.

4. On a prosecution for murder, a requested instruction upon the law of self defense was properly refused because it ignored the necessity of the defendant to take the life of the deceased in order to save his own life.

5. An instruction is properly refused when the facts postulated therein do not warrant a verdict of not guilty.

6. An appellate court has no original jurisdiction to set aside verdicts and grant new trials because of the insufficient evidence to sustain the verdicts. Such court acts only upon a ruling of the trial court refusing a new trial upon that ground, where such ruling is erroneous, and in determining this question the evidence upon which the verdict of the jury and the ruling of the court below are predicated will be considered. If there is evidence legally sufficient to support the verdict, and the verdict has been approved by the trial judge, the appellate court will not disturb it, though there be conflicts in the evidence, unless the preponderance of the evidence is such that the jury must have been improperly influenced to render the verdict.

7. A past quarrel or encounter, if sufficient time for the cooling of passion has transpired, will not reduce the killing from murder to manslaughter.

8. When a man has been threatened he is to judge from the circumstances by which he is surrounded and as they appear to him, but when he acts upon appearances and takes the life of his fellow man, he does it at his peril, and he cannot justify such killing unless there are circumstances which would induce a reasonably cautious man to believe that it was necessary to save his own life, or to save himself from great personal injury.

9. When a man has been threatened he may go wherever his legitimate business calls him, but he has not the right to lie in wait for and slay his adversary; neither may one who seeks a person who intends to kill him, or otherwise brings the danger upon himself, avail himself of the plea of self defense.

10. In order that a person may be convicted of murder in the first degree, he must have acted from or in pursuance of a premeditated design to effect the death as alleged; proof of a mere intent to kill would not be sufficient. Such design

must precede the killing by some appreciable space of time, but the time need not be long. It must be sufficient for some reflection or deliberation upon the matter, for choice to kill or not to kill, resulting in the formation of a definite purpose to kill.

11. Whether a premeditated design to kill was formed must be determined by the jury from all the circumstances of the case.

12. Evidence examined and found sufficient to sustain a verdict of murder in the first degree. (TAYLOR and HOCKER, JJ., dissenting.)

This case was decided by the court En Banc.

Writ of Error to the Circuit Court for Wakulla County.

The facts in the case are stated in the opinion of the court.

*Nat R. Walker*, for the plaintiff in error;

*W. H. Ellis,* Attorney General, for the State.

PARKHILL, J.—The plaintiff in error was indicted for, tried and convicted of the crime of murder in the first degree in the Circuit Court for Wakulla County; and seeks relief here by writ of error, from the sentence of death imposed upon him.

The first assignment of error is: "The court erred in not excluding from the jury one J. Edgar Pigott, who was challenged for cause to-wit; upon the ground that he the said juror was a second cousin and the brother-in-law of the deceased."

The record shows that one Edgar Pigott was a mem-

ber of the jury that tried and convicted the defendant; but it does not appear anywhere, except in the motion for a new trial, that the defendant objected to or challenged the said juror upon the ground stated. Although the said objection to the juror is made a ground of the motion for a new trial, it is not sustained by affidavit or otherwise. A fact asserted in a motion for new trial is not self-substantiative before this court, but it must be authenticated otherwise in the transcript of record. Oliver v. State, 54 Fla. 93, 44 South. Rep. 712; Horne v. Carter, 20 Fla. 45. Therefore this assignment fails.

The fourth, fifth and sixth assignments of error are based upon the refusal of the court to give the following instructions requested by the defendant: "First. . If you believe at the time when Noah Pelt left the defendant and went over to Gwaltney's store immediately after the fight between the defendant and himself and that the defendant Barnhill had reasonable ground to apprehend or conclude that by Noah Pelt going into said store, knowing that there was a Winchester rifle in said store that Noah Pelt would do him some great personal injury, and that the defendant Barnhill believed that he was in imminent danger that such design would be done by Pelt's entering Gwaltney's store, you should find a verdict of not guilty."

"Second. If you find that the defendant Miley Barnhill sought an interview or left his store, believing that Noah Pelt had cursed his wife saying, "come out there you damn bitch," in order to ask the deceased what he meant by abusing his wife and that he left his store with no hostile intention but solely to have the deceased explain his language so used and a wordy altercation ensued, and Noah Pelt, the deceased, became angry, and during which time the deceased assaulted Miley Barnhill, the defendant, with a deadly weapon, a

pocket knife, in such a manner as to create in the defendant's mind a reasonable apprehension of serious bodily injury, and that after an infliction on the defendant by the deadly weapon a pocket knife in the hands of the accused, that he went into Gwaltney's store immediately afterwards saying that he was going after a gun to kill the Miley Barnhill, the defendant, and Miley Barnhill acting under a reasonable apprehension of death or some bodily harm, you should find your verdict not guilty."

"Third. If you believe that Noah Pelt, the deceased, beat Miley Barnhill on the head with a pocket knife, and the defendant received wounds from the beating and reasonably appeared to the defendant, that the fight between Noah Pelt and the defendant was not over and that though Noah Pelt had left him going into Gwaltney's store, that he would soon return and that he would receive additional bodily injury from the Noah Pelt, and Noah Pelt had the ability to inflict the injury, and that the danger was threatening and imminent, and under such circumstances, and so believing, the defendant shot and killed Noah Pelt, that he was justifiable upon the ground of his necessary self-defense, and you should find him not guilty."

The court ruled correctly when he refused to give all these instructions. We will not attempt to point out all the defects in them. Their inaccuracies will more fully appear when we come to discuss the evidence and the law applicable thereto. Suffice it to say, they do not limit the jury to the evidence in determining whether the facts enumerated in the instructions are true, but they instruct the jury to find a verdict of not guilty if they *believe* certain facts, without requiring the jury to believe these facts from the evidence. Care should always be taken to instruct the jury that they must base their

verdict upon the evidence adduced before them. Doggett v. Jordan, 2 Fla. 541. In the cited case, the court said: "There are few points upon which jurors are most apt to mistake, than in supposing that they may find their verdict upon their own knowledge of the case, acquired before they took their seats in the jury box." Even if charges given require the jury to make their finding only on the evidence, that will not perfect the requested instructions.

The first of these instructions is erroneous in calling for a verdict of not guilty if *"the defendant Barnhill believed* that he was in imminent danger that such design would be done by Pelt's entering Gwaltney's store." The instruction should have been so framed as to inform the jury that the defendant could not justify the killing unless he had reason to believe and did believe that it was necessary to save his own life or to save himself from great personal injury.

The second of these instructions is erroneous in basing the innocence of the defendant upon his acting under a reasonable apprehension of death or *some* bodily harm. The danger must be imminent. Section 3203 of the General Statutes of 1906; Alvarez v. State, 41 Fla. 532, 27 South. Rep. 40; Sylvester v. State, 46 Fla. 166, 35 South. Rep. 142; Gladden v. State, 12 Fla. 562.

The third instruction is erroneous in several respects. If the defendant believed or had reason to believe that he would receive "additional injury" from Pelt and that the danger (of receiving "additional injury") was threatening and imminent he would not be justified in taking Pelt's life. As this instruction is framed, the defendant would be justified in killing Pelt, if the additional injury were only a blow with the open hand. The reasonable appearance of additional injury to the defendant from Pelt, and the defendant's belief that such

danger is threatening and imminent will not alone justify the defendant in taking Pelt's life, he must have had reason to believe and believed that he was in *imminent danger of death or great bodily harm and that it was necessary for him to so* take the life of Pelt in order to save his own life. The facts do not warrant the third instruction, and the facts postulated therein do not warrant a verdict of not guilty. Hisler v. State, 52 Fla. 30, 42 South. Rep. 692.

The second, third and seventh assignments of error may be considered together: That the verdict is contrary to the law, the charge of the court and the evidence.

The substance of the evidence is as follows: C. B. Stephenson for the State testified that he knew the defendant though he was not personally acquainted with him; that he did not know the deceased. I was standing on the corner of the depot platform on the day of the tragedy and saw two men come up with a wagon and team which they hitched to a tree in a southeast direction from the defendant's store. One of these men I afterwards learned was the deceased Noah Pelt. They then went to Gwaltney's store. A little while afterwards I saw the deceased coming from Gwaltney's store going in the direction of his wagon and passing in front of the defendant's store. A cow was eating from a wagon near the defendant's store, and when he got directly in front of the store he said "eat it you damn bitch," and passed about ten feet further on when the defendant came out of his restaurant, the door of which was closed when Pelt spoke to the cow. The defendant came up to Pelt and they talked a little while, but I could not hear what they said. The wind was blowing hard and prevented my hearing what they said. They came in front of the store and quarreled. The defendant was facing me and I saw him reach out and catch Pelt in the collar and

they then engaged in a fist and skull fight and Barnhill was worsted. They fought half way across the street towards the depot and then stopped fighting. Pelt then drew his knife from his pocket but did not open it. Then Barnhill said "You are going to use your knife are you," and turned toward his store and as he turned Pelt struck him on the side of the head with his hand closed on the unopened knife. Barnhill staggered a little after the blow and went to his store and Pelt said to him: "Get your gun and shoot me," and turned and walked to the depot platform and then went to Gwaltney's store, and I went around to the other side of the platform to avoid seeing what else might happen and soon heard the report of a gun. On cross-examination this witness said in substance: Barnhill's store and restaurant was just across the street, (in the village on the railroad called Arran), from the depot—on the east side of the street. The fighting commenced directly in front of the steps to Barnhill's store. They talked a very little while before they commenced to fight. Some negroes were sitting on the depot platform just before the difficulty. I don't know whether Pelt hurt Barnhill when he struck him. Presume he did. He struck a quartering blow and Barnhill dodged his head. Pelt came across the street and stopped on the depot platform after separating from Barnhill. Barnhill was bleeding after the first blow given him somewhere about the eyes. The difficulty occurred about 11 or 12 o'clock in the day. The doors of Barnhill's store and restaurant were closed as they appeared to me. I saw nothing further after deceased stood on the platform and Barnhill stood at the steps of his restaurant door. Pelt was mad and cursing when I walked around the depot to avoid seeing more. The last I saw of Pelt he was standing on the platform.

J. C. Council for the State testified substantially as

follows: I know the defendant and knew the deceased Noah Pelt. The latter is now dead. He was shot in the head and killed in Wakulla County, Florida. I was at Arran on December 14th, 1907, and saw Noah Pelt and Tomlinson come up there in a wagon and Pelt hitched the mule and walked to Gwaltney's store. Afterwards I heard fighting outside of depot building. I was in the building at the time. I went out of the depot and saw the defendant, Barnhill, with a gun in his hand go to front of Gwaltney's store and stop and then put the gun up to his shoulder with the muzzle pointing in the doorway of the store and sight for some time and then shoot, and I then heard something fall in the store. The defendant then took the gun down from his shoulder and turned to go to his store, and said: "I wound up that little rumpus damn quick." I saw him going to Gwaltney's store with the gun. It was a breech-loader. He broke it and threw out the shell. Barnhill's restaurant is about 40 yards from Gwaltney's store. He held the gun to his shoulder and sighted so long that I began to think that he wasn't going to shoot. I went to Gwaltney's store just after the shooting and saw Pelt lying in the store dead with blood streaming out of the side of his head. I was standing at the northwest corner of the depot when I saw Barnhill go to Gwaltney's store with a gun and shoot into the doorway.

Drew Vickers for the State testified in substance as follows: I knew Noah Pelt and knew the defendant. Pelt is now dead. I saw him after his death in Gwaltney's store at Arran. Pelt came into Gwaltney's store and about five minutes afterwards Barnhill came to the door of the store with a gun, and shot Pelt through the doorway, Pelt was doing nothing when he was shot. Pelt fell to the floor and died. I was standing in the store at the time and saw Barnhill when he first came up

to the store door, and saw him when he shot and killed Pelt. Cross-examination. Pelt was cursing when he came into Gwaltney's store. I did not hear him ask for a gun. I think he was cursing Barnhill. Pelt had been in the store about five minutes when Barnhill came to the door and shot him.

Alfred Tucker for the State testified in substance as follows: I know the defendant and knew Noah Pelt who is now dead. I was in Gwaltney's store at Arran at the time Pelt was killed. I heard fighting going on on the outside of the store and went to the door and looked out and saw Pelt strike Barnhill on the head with his fist and then go to the depot platform and say to Barnhill "shoot you damn cowardly son of a bitch," I turned from the door and saw no more until Pelt came into Gwaltney's store. He came into the store and stood by the counter and asked if there was a gun in there, and I said "No." While Pelt was standing by the counter in the store Barnhill came to the store door and shot him dead without giving him time to say anything.

Cross-examination. I saw Pelt strike Barnhill with his fist. I saw no knife in his hand at the time. I don't know whether there was a gun in the store when Pelt asked if there was one there. When Pelt stepped up on the porch he asked if any gun was there and I said "No."

Re-direct. Pelt got no gun and had none when he was shot.

Joe Tucker for the State testified in substance as follows: I was in Gwaltney's store at Arran on December 14th last and saw Noah Pelt come into the store and about five minutes afterwards Miley Barnhill came to the door of the store and shot and killed him.

Cross-examination. I don't know whether Joe Oaks' rifle was in the store that day. He kept it there. I did not hear Pelt call for a gun or make any threat about

Barnhill.  Pelt was talking loud and cursing, saying what a man he was.  He got no gun in the store.

Henry Willis for the State testified in substance as follows:  I was present when Noah Pelt was killed.  He was killed in Gwaltney's store.  Miley Barnhill shot him.

Cross-examination.  I was standing on depot platform and saw blood on the back of Barnhill's head.  Pelt was in Gwaltney's store.  I was not present during the fighting.  I saw Pelt after he was dead.  I saw Barnhill shoot.  After Barnhill and Pelt separated, Barnhill went to his restaurant and got his gun.  He was not staggering.

Lewis Gwaltney for the State testified in substance as follows:  I live at Arran and keep store with Alfred Tucker.  I knew Noah Pelt.  He is now dead.  I saw him dead in my store on the 14th day of last December.  I do not know anything about what happened on the outside of the store—of course I heard them fighting, and heard Noah Pelt when he came into the store and asked if a gun was in there, and I said "No." He, Pelt, had his knife unopened in his hand when he entered the store.  He seemed to have got quieted down before I saw Barnhill point a gun in the store door and fire; and when he fired Pelt fell quartering behind the counter, and when I looked at Pelt he was dead and was bleeding badly from his head.  I don't know how long it was after Pelt first entered the store before Barnhill came there and shot him, but it seemed to be some time.  It was time enough for Pelt to seem to cool down and get quiet.  It might have been five or six minutes.  I can't say.

Cross-examination.  It is about thirty yards from the north side of the depot platform to my store in Arran.  Pelt when he came into my store said "boys give me a

gun."· He was mad and cursing but never· cursed at Barnhill, was just cursing and saying what a man he was. Pelt had an unopened knife in his hand when he entered my store and had it in his hand when he was shot and after he fell. There was no gun on the counter when Pelt came into the store, but there was a Winchester rifle hanging up in the back part of the store under a coat. That rifle was usually kept in the store when its owner, Joe Oaks, was not using it, and he also kept his trunk and clothes in there too. Pelt never went where the rifle was, and never knew any rifle was in the store.

Here the State rested its case.

John Laws, a defendant's witness, testified in substance as follows: I know the defendant Barnhill and knew Noah Pelt. I did not see the fight which occurred between them. I was going at the time to my house and was about two hundred yards from the northeast side of the depot and Barnhill's restaurant was between me and where the fight took place. · I heard loud cursing and heard the fuss like some persons were fighting. After a short while I saw Pelt go into Gwaltney's store and heard him cursing loudly. From where I was standing I did not see him until after he had left the place where, I judge, he was fighting with Barnhill, and when he got in the open space between Gwaltney's store and Barnhill's store I could then see him plainly. I then turned again to go home when I heard a gun shoot. It could not have been longer than two minutes after I saw Pelt enter Gwaltney's store before I heard the gun shoot. It might have been longer, but I don't think it possible, for I had just turned round and walked a few paces when I heard the gun shoot. The witness here

identified and verified a plat of the scene of the fight and tragedy showing the surrounding buildings mentioned in the evidence of the different witnesses.

E. H. Laws for the defense testified substantially as follows: I was at Arran on the day Noah Pelt was killed. I was standing near the railroad pump and saw an arm reach out and strike Miley Barnhill. I then saw Barnhill go to his restaurant and Pelt go to Gwaltney's store. It was Pelt who struck Barnhill. I was standing right against the water tank and the corner of the freight house prevented my seeing the fight. Pelt went over to Gwaltney's store right after he struck Barnhill and the latter went to his restaurant. I saw nothing further of the fight. I was some distance from them. Pelt was cursing and I heard him say "you damn son of a bitch shoot me if you want to." This occurred after the striking. I heard the report of a gun a short while or a few minutes after Pelt went into Gwaltney's store.

Cross-examination. A few minutes after I went into the pump house I heard the report of a gun.

Hagar Wilson for the defense testified substantially as follows: I heard Noah Pelt as he came by the door of the house called restaurant, in which I was sitting with my back to the door, which was half open, curse, saying: "Come out there you damn bitch." Mrs. Barnhill was fixing dinner on the table and Mr. Barnhill was behind the counter. When Mrs. Barnhill heard Pelt curse like that she said: "My Lord listen." Then Mr. Barnhill went out from behind the counter bareheaded, right out to Mr. Pelt and asked him what he meant, saying: "Mr. Pelt I would not curse before your family like that." Mr. Pelt then said: "Don't you like it?" Mr. Barnhill said, "No, I don't." Then Pelt called Barnhill "a damn son of a bitch" and they went to fighting. I don't know who struck the first lick—just

went to fighting.  When Mr. Barnhill went out to meet Mr. Pelt Mrs. Barnhill and myself stood in the doorway and saw them fighting.  They kept on fighting until they got clear across to depot when Barnhill pulled loose from Pelt and turned round and started towards his house when Pelt ran his hand in his pocket and pulled out his knife and struck Barnhill twice on his head, which looked like it staggered him, and when the fight stopped Barnhill came to his store and Pelt went to Gwaltney's store.  I did not see Pelt jump up on the platform, but heard him say "boys hand me a gun," and the boys sitting there jumped up and ran away.  I saw no gun and heard nothing else and saw no more.  I shut the door.  I heard the report of the gun after Pelt went into Gwaltney's store.  It was no time hardly after I saw Pelt go into Gwaltney's store before I heard the gun fire.

Cross-examination.  I saw none of the boys with guns and they all ran away.

Dan Wright for the defense testified in substance as follows:  I was sitting over on the depot platform near Thomas Hallman and Arch Miles, and had a gun lying across my lap and saw Mr. Pelt come out of Gwaltney's store with a sack in his hand, and when he got in front of Mr. Barnhill's restaurant I heard him say "Get out of there you damn bitch," then Mr. Barnhill came out and told Mr. Pelt not to curse there, and Pelt asked him if he did not like it, when they both went to fighting and fought clear over to the depot platform near where Thomas Hallman, Arch Miles and myself were sitting, when they quit fighting and Mr. Barnhill turned to go back to his house Pelt run his hand in his pocket and pulled out his pocket-knife and struck Barnhill on his head with the jaws of his knife.  Barnhill then turned and walked off toward his store-house and Mr. Pelt then

asked me to hand him my gun, but I would not let him have it, and then run over to Mr. Vanse's store back of the depot and heard no more. Pelt cursed a time or two in the fight. He asked for my gun but never tried to take it from me. Barnhill first spoke to Pelt in a quiet manner and did not seem to be mad. I was never in the employ of Barnhill, or ever worked for him at all at no time.

Cross-examination. I could not tell who struck the first lick, whether it was Barnhill or Pelt, they both seemed to go together at once. When Pelt asked for my gun I don't remember what he said he wanted with it. I jumped up and ran back of the depot to Vanse's store and hid my gun. I had just got to Vanse's door from hiding my gun when I heard the report of the gun.

Arch Miles for the defense testified in substance as follows: I know the defendant. I am not in his employment. I saw the fight between him and Pelt. I was sitting on the platform near Dan Wright and Tom Hallman. They fought to near the depot, almost up to where I was sitting when they pulled from each other, stopped fighting and Barnhill turned to go back, when Pelt pulled his knife out of his pocket and struck Barnhill two licks on his head and then turned to Dan Wright and asked for his gun. Wright did not give him the gun, but jumped up and ran, and then Pelt got on depot platform, pulled off his coat and said to Barnhill "shoot damn you," then went across to Gwaltney's store, and Barnhill went into his store and got his gun and then went to Gwaltney's store and shot. I am not employed by Barnhill, nor have I ever been in his employ, or not employed by any of his people. I am now employed at Carrabelle with Mr. Revells.

Cross-examination. I never saw Barnhill come out of his door. He was on the outside when I saw him. I

sat on the platform at the same time as the other boys. There were two guns there, mine and Dan Wright's.

Isaac Broward for the defense testified in substance as follows: I know the defendant. I was at Arran on the day of the fight between the defendant and Noah Pelt. I was about 75 yards away on an engine and just saw them fighting. I saw them stop fighting and part, and Pelt struck Barnhill when parting. He struck him with his fist. He did not stagger from the blow. I then saw Pelt go towards Gwaltney's store. I never heard a word. The warehouse obstructed my view and kept me from seeing more. I don't know whether Pelt had a knife.

Mrs. Dora Barnhill for the defense testified in substance as follows: I am the wife of the defendant. When Mr. Pelt came by the restaurant on the day he was killed, between 11 and 12 o'clock, nearly 12—Hagar Wilson was sitting with her back turned to the front door which was about half open. I was fixing dinner on the table and Mr. Barnhill was behind the counter. When Mr. Pelt passed by the door and looked in and said, "You damn bitch come out there." I said "My Lord listen." Mr. Barnhill then came behind the counter and went to the store steps where Pelt was standing outside, and said to Pelt in a kind tone "Mr. Pelt I would not curse before your wife and furthermore I would not curse around your family." Mr. Pelt then said "Don't you like it?" Mr. Barnhill said "No, I don't like it." Then Pelt said "You God damn son of a bitch you have not got it to take." They then went to fighting and fought until they got over to the warehouse porch, and then Mr. Barnhill tore loose from Pelt and then Pelt pulled out his pocket-knife and struck Mr. Barnhill over the head twice with the jaws of his knife which staggered him, and then turned to Dan Wright who was sitting on the warehouse porch and asked Dan to give

him the gun that he wanted to "kill the damn son of a bitch." Then Pelt jumped up on the platform and pulled off his coat and vest and cursed Mr. Barnhill with all sorts of damn son of bitches and then walked on down very fast to Mr. Gwaltney's store which was an opposite direction from his wagon, saying "You God damn son of a bitch I will go over to Gwaltney's store and get a gun and kill you." He then entered Gwaltney's store where I knew a Winchester rifle was constantly kept and which was lying there on the counter about two hours before, for I saw it there. Mr. Barnhill was badly hurt from the wounds made on his head from the blows struck by Pelt's knife. The blood was streaming down from his head. When I saw Pelt going after the rifle and heard him say that he was going to kill Mr. Barnhill I ran back into the restaurant and did not see any more. When I heard the gun shoot I thought that Pelt had shot Mr. Barnhill. I knew that a rifle was kept in Gwaltney's store because the rifle belonged to Mr. Joe Oaks who was a deputy sheriff, and Mr. Oaks kept all his things there and his trunk. When I last saw Mr. Barnhill on that occasion he did not have a gun in his hand, but his gun was kept in the store-house where we sold groceries and we eat in the restaurant which was almost joining, in which I ran and went to the back part of it when I heard the gun shoot.

G. W. Spears for the defense testified in substance as follows: I did not see any of the fighting between Barnhill and Pelt. I saw neither of them, but heard fussing near the depot. I was sitting at the time over at Vanse's store not a hundred yards on the west side of the depot from Gwaltney's store when Dan Wright came running over to Vanse's store and passed by me near the door and hid his gun, which he had in his hand, in a barrel behind the end of the counter. He no sooner put his

gun in the barrel when I heard a gun shoot over at Gwaltney's store. The reason I did not see the fighting was because the depot was between me and the place they were fighting. Yes I am certain I heard the gun shoot. Dan Wright had hardly got his gun hid in the barrel before I heard the gun shoot.

Thomas Hallman for the defense testified in substance as follows: I was sitting near Dan Wright and Arch Miles on the end of the depot platform on the north side near the steps which was right across from where Mr. Barnhill kept his restaurant. He also kept a store, but not in the same building but nearly joining, and I saw Mr. Pelt pass by Barnhill's restaurant before he was shot. The restaurant door was about half shut. When Pelt got opposite Barnhill's door he stopped and said "you damn bitch" or "bitches," I could not understand which, "you come out of there." Not long after he spoke these words Mr. Barnhill came out from his restaurant bareheaded and said like this: "Mr. Pelt I would not curse around your family like that;" then Pelt said "if you don't like it you need not take it you God damn son of a bitch." They then went to fighting and fought across nearly to where Dan Wright, Arch Miles and myself were sitting. They then stopped fighting and it seemed that Barnhill jerked loose from Pelt and started back towards his restaurant when Pelt pulled out his knife and struck Barnhill two licks with it unopened on his head which staggered him. Barnhill then started to walk off, when Pelt turned to Dan Wright and said "give me your gun." Dan would not let him have his gun, and me and Dan run away from the depot as Pelt started over to Gwaltney's store and I did not hear the report of the gun. When Pelt tried to get Dan Wright's gun he said "I want the gun to kill the damn son of a bitch." I

never worked for Barnhill in my life and never had any business with him.

Cross-examination. Q. Which one struck first when Barnhill went out to meet Pelt? A. They both seemed to run together about the same time.

The defendant on his own behalf testified in substance as follows: About half past eleven o'clock I was behind my counter with the door about half shut, and Hagar Wilson, a colored woman, was sitting behind it on the north side of the door inside of the restaurant, and my wife was fixing dinner on the table. The door was about half open, wide enough for you to see inside the building and for anyone standing on the outside to see my wife who was near the door on the inside. Noah Pelt came by the door and stopped and said "you damn bitch come out of there." Then my wife said "Oh Lord, do listen." I then walked out to where Pelt was standing and said to him in a friendly manner, for I was not mad, "Mr. Pelt I would not curse your wife for that, nor would I curse like that around your family." Pelt answered: "Don't you like," and I replied, "No, and you certainly would not like it either." Then Pelt said "You God damn son of a bitch it will take less to do you," and then we went together. We fought then across the road until we got near the steps on the northeast end of the depot when I snatched away from him and started back to my place, when Pelt before I knew it pulled out his knife and struck me one blow on the side of my head and another blow on the back of my head that came near knocking me down and staggered me, and almost blinding me with the blood running down all over my face and neck from the deep cuts he gave me on my head by the jaws of his knife. He then turned around and went up to where Dan Wright and Thomas Hallman were sitting on the platform near the steps on the northeast side

and tried to get Dan Wright's gun from him, saying at the time "Give me your gun, I want to kill the damn son of a bitch." Dan Wright then ran around the depot. After Pelt failed to get the gun from Dan Wright he pulled off his coat and vest and started to Gwaltney's store about twenty-five or thirty steps from where he pulled off his coat and vest and said to me, "You God damn son of a bitch go and get your gun and shoot, for I am going in Gwaltney's store and get a gun and kill you." I knew that a Winchester rifle was kept at Gwaltney's store for I saw it lying on the counter about two hours before the fight, and I was certain that Pelt meant what he said, and as I had only some small shot shells, I knew that I would not stand any show unless I got to him and shot first, so I got my gun and placed the shells in the gun when I was going. I did not know but what Pelt would certainly get Joe Oaks' rifle which was in the store, and shoot me was the cause of my getting my gun. It was hardly any time after Pelt left me going to Gwaltney's store before I got my gun; just as soon as he made for the gun in Gwaltney's store I ran into my store house, which almost joins my restaurant and got my gun, and did not wait to put any shells in it but loaded as fast as I could going along.

Cross-examination. I did not see Pelt when he first passed my door for I was behind the counter, but I heard him say "You damn bitch come out of there." The wind had blown the door about half shut, but my wife could see him plainly where she was standing, and I believed he was cursing at my wife. I was not mad when I went out to see Pelt, I went out and asked him about cursing my wife, and he then called me a "God damn son of a bitch," and said if I did not like it, it would take less to do me. Q. It was then you got mad? A. Yes, it was enough to make any man mad that had any spunk at all.

Q. Then you did not get mad when he cursed your wife for a damn bitch but only got mad when he cursed you? A. No, I did not get mad until he cursed me for a damn son of a bitch, and I thought it was time for any man to get mad at that and fight too. Q. Did you strike Pelt first or did he strike you first? A. I don't remember— we both run together at the same time. I am certain that the fight between us commenced in front of my restaurant—and I was sure he came by my place to pick a fuss with me, for he stopped in front of my place until I went out to him, and he could have gone back of my store to his wagon which was the nearest way from Gwaltney's store from where it was said he came from to his wagon, and I don't know what else he wanted.

In Harrison v. State, 39 Fla. 514, 22 South. Rep. 747, this court said: "We have no original jurisdiction to set aside verdicts and grant new trials because of insufficient evidence to sustain such verdicts. We act only upon a ruling of the lower court refusing a new trial upon that ground, where such ruling is erroneous, and in determining this question we look to the evidence upon which the verdict of the jury, and the ruling of the court below, are predicated. If there is evidence legally sufficient to support the verdict, and this verdict has been approved by the presiding judge, we have no right to disturb it, though there be conflicts in the evidence, unless the preponderance is such that the jury must have been improperly influenced to render the verdict."

First, it is contended that the verdict is not supported by the evidence because, in view of the evidence, the jury was not authorized to convict the defendant of any crime —that the defendant acted in self defense in taking the life of the accused.

It may be that, in the beginning of the trouble between the deceased and defendant, the deceased was the

aggressor, and, if he intended his remarks for the wife of the defendant instead of for the cow, the defendant may have been justly aroused to a defense of his home and his family. The defendant might be said to have very properly resented this insult though he was worsted in the effort. Then the parties pulled away from each other, the defendant going to his store, and the deceased going to the depot across the street. The witnesses for the State do not support the claim made by the defendant that the deceased told the defendant that he was going to Gwaltney's store to get a gun and return and kill the defendant. On the contrary the testimony for the State is to the effect that the deceased told the defendant to get his gun and shoot him. Be that as it may, the proof is abundant—it seems to be admitted by all—that the defendant killed the deceased by shooting him at a time when the deceased was making no effort to do the defendant any bodily harm. He seemed to have quieted down before defendant shot him. (Gwaltney's testimony.) Indeed the jury might have inferred that the deceased did not know who shot him, unless in his dying moments he supposed the defendant shot him by reason of the difficulty in which both of them had been engaged. The defendant followed the deceased to Gwaltney's store, a distance of thirty or forty yards. "While Pelt was standing by the counter in the store Barnhill came to the store door and shot him dead without giving him time to say anything." (Tucker's testimony.) "Barnhill came to the door of the store with a gun, and shot Pelt through the doorway. Pelt was doing nothing when he was shot." (Vichers' testimony.) The deceased had his knife unopened in his hand, but had no gun when he was shot. (Gwaltney's and Tucker's testimony.) The defendant turned to go to his store and said: "I wound up that little rumpus damn quick."

But it is said the defendant was justified in so shooting and killing deceased because in the beginning he was the aggressor and cursed. the defendant and threatened to kill the defendant, saying that he would get a gun from Gwaltney's store and would return and kill the defendant; and it is contended that these circumstances as they have been detailed by the witnesses justified the defendant in the belief that he was in imminent danger of death or great bodily harm and that it was necessary for him to so take the life of the deceased in order to save his own life.

Even if it be true that the deceased had threatened to kill the defendant, it also appears that at the time the deceased was shot and killed he was doing nothing that evinced an immediate design to execute said threats. Johnson v. State, 29 Fla. 558, 10 South. Rep. 686. At the time he killed the deceased, the defendant may have had reason to apprehend generally bodily harm from the previous encounter, from feelings then engendered and threats then made. There could be no justification for the killing unless the deceased was in such a situation at the time of the killing as to endanger defendant's life or place him in danger of great bodily harm. Gladden v. State, 12 Fla. 562.

If a man whose life has been threatened, meets and slays his adversary under such circumstances as show that at the time his adversary was making some demonstration indicating an intention to then execute his threats, and that he believed, and had reasonable ground to believe, that his life was then in danger, or that he was in danger of great bodily injury, such homicide is justifiable, although it may turn out that the deceased had no intention at the time to execute his threats. The party threatened is to judge from the circumstances by which he is surrounded and as they appear to him; but

when a man acts upon appearances and takes the life of his fellow man, he does it at his peril, and he cannot justify such killing unless there are circumstances which would induce a reasonably cautious man to believe that it was necessary to save his own life, or to save himself from great personal injury. When a man has been threatened he may go wherever his legitimate business calls him, but he has not the right to lie in wait for and slay his adversary; neither may one who seeks a person who intends to kill him, or otherwise brings the danger upon himself, avail himself of the plea of self defense. Smith v. State, 25 Fla. 517, 6 South. Rep. 482; Clark's Criminal Law, 141.

The jury were authorized to conclude from the testimony that the defendant shot and killed the deceased from a spirit of revenge rather than in lawful self-defense.

Second, it is contended that the evidence is not sufficient to support a finding that the defendant acted from a premeditated design to effect the death of the deceased.

Undoubtedly in order that the defendant may be convicted of murder in the first degree, he must have acted from or in pursuance of a premeditated design to effect the death of the deceased, a mere intent to kill would not be sufficient. Such design must precede the killing by some appreciable space of time, but the time need not be long. It must be sufficient for some reflection or deliberation by the defendant upon the question of killing the deceased, for choice to kill or not to kill, resulting in the formation of a definite purpose to kill. Lovett v. State, 30 Fla. 142, 11 South. Rep. 550, 17 L. R. A. 705; Garner v. State, 28 Fla. 113, 9 South. Rep. 835. 29 Am. St. Rep. 232; Olds v. State, 44 Fla. 452, 33 South. Rep. 296. "There must be such an interval of time between the intent and the act as will repel the presumption that

it was done upon a sudden impulse, conceived and executed almost instantaneously." Carter v. State, 22 Fla. 553, text 559. The human mind acts with celerity which it is sometimes impossible to measure. Whether a premeditated design to kill was formed must be determined by the jury from all the circumstances of the case. Kicks v. State, 25 Fla. 535, 6 South. Rep. 441; Lovett v. State, 30 Fla. 142, 11 South Rep. 550; Blige v. State, 20 Fla. 742; Adams v. State, 28 Fla. 511, 10 South. Rep. 106; Carter v. State, *supra*.

It may be that the jury could not tell from the evidence the exact number of minutes within which the defendant may have formed a premeditated design to kill the deceased. It is not essential to the formation of a premeditated design that any particular number of minutes elapse between the intent and the act. There was evidence from which the jury could infer that six minutes elapsed while the deceased was in Gwaltney's store before the defendant followed him there and killed him. In addition to this time—these six minutes—there was the time that the defendant walked towards his store after becoming separated from the deceased, and there was the time that the defendant stood on his steps, while the deceased was at the depot. The defendant had time to go to his store and procure his gun and ammunition, and there was time for the defendant to walk from his store to Gwaltney's store and there was time for the defendant to present his gun and pause so long that a witness thought the defendant would not shoot. "Pelt came across the street and stopped on the depot platform after separating from Barnhill" * * * "deceased stood on the platform and Barnhill stood at the steps of his restaurant door." (Stephenson.)

"Pelt got on depot platform, pulled off his coat and said to Barnhill 'shoot damn you' then went across to

Gwaltney's store, and Barnhill went into his store and got his gun and then went to Gwaltney's store and shot." (Arch Miles, a witness for defendant.) The defendant went to the front of Gwaltney's store and "put the gun to his shoulder with the muzzle pointing in the doorway of the store and sight *for some time* and then shoot." "He held the gun to his shoulder and sighted *so long* that I began to think that he wasn't going to shoot." (J. C. Council). The jury could not tell whether there were six, or possibly more minutes for the defendant to form a premeditated design to kill the deceased. But the formation of a premeditated design does not depend upon the proof of any particular number of minutes. It depends upon the state of mind of the defendant and this may be arrived at from his actions in connection with the length of time within which his mind had to act. The jury could infer something of the defendant's state of mind from his statement that he knew that a rifle was kept in Gwaltney's store and that he would not stand any show unless he got to Pelt and shot first. Although this statement may not justify his actions, it is sufficient to show that the defendant was thinking, deliberating upon what he was doing. From all the surrounding circumstances, the jury could legally infer that, although the defendant may have been under the influence of anger and resentment at the time of the killing, the degree of feeling was not such as to cloud his senses or to impair his reason, that subsequently to his forming the design and before executing it sufficient time elapsed for an ordinarily reasonable man to have regained his self possession; that there was such an interval of time between the intent and the act as would repel the presumption that it was done upon a sudden impulse, conceived and executed almost instantaneously; that there was sufficient time for deliberation upon the matter,

for choice to kill or not to kill, and that the defendant formed a premeditated design to kill and in pursuance of that design killed the deceased.

The facts and circumstances in the instant case point much more strongly to murder in the first degree than those in Carter v. State, 22 Fla. 553, where a policeman ordered the prisoner to move on or get off the sidewalk, the prisoner refused and the deceased struck or punched him with his club, whereupon the prisoner went into a barroom before which he was standing, making threats, and returned with his hand in his pocket, a fight ensued in which the deceased was shot and killed.

There is conflict in the testimony, but the verdict of guilty indicates that the jury did not believe the defendant's version of this unfortunate affair. There is sufficient evidence of all the facts essential to the conviction as found by the jury, and it does not appear that there was such a preponderance in favor of the defendant that the jury were not governed by the evidence in their finding.

The jury saw the witnesses and heard the evidence, a learned and conscientious judge who has long graced the bench presided at the trial and approved the verdict. We cannot set aside the verdict of the jury or overrule the action of the trial court thereon. The verdict is not without evidence to sustain it, and under the well settled rule the judgment is affirmed.

SHACKLEFORD, C. J., and COCKRELL and WHITFIELD, JJ., concur.

TAYLOR, J., (*dissenting*).—I cannot agree to the conclusions reached by the majority of the court in this case on the evidence adduced therein. The testimony shows that the deceased was the aggressor who wantonly

brought on the difficulty that resulted in his death; and my view is that the testimony makes out a case simply and purely of manslaughter, nothing more. The time elapsed between the time when the deceased and the defendant were engaged in an active fight with each other and the time when the defendant shot and killed the deceased was too short for the defendant to have become so cool as to be able to form that premeditated design to take the life of his assailant that is necessary to a conviction for murder. My view is that the testimony makes out only a case of a killing in the heat of passion aroused by the deceased as the aggressor, and that the judgment of conviction should be reversed on the ground of the insufficiency of the evidence to support the verdict, and a new trial awarded.