EDWARD ALVAREZ, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. Counsel for the prosecution in a criminal case are not bound to introduce all the witnesses whose names are endorsed upon the indictment and who are shown by the State's evidence to have witnessed the commission of the offence.

2. A general assignment of error alleging error in giving or in refusing to give a number of instructions asserting separate and distinct propositions of law, will be overruled if any one of the instructions so embraced in such assignment be found in the one case to have been properly given and in the other properly refused.

3. An instruction in a criminal case which puts the burden upon the State of negativing beyond a reasonable doubt defensive matter, the burden of affirmatively showing which is upon the defendant; and that too, whether he affirmatively establishes such matter by proof or not, is properly refused.

4. Though the danger need not be actual, nor the necessity to kill real, to justify a homicide in self-defense, yet the circumstances surrounding and as they appear to the slayer at the time he does take life must be such as would induce a reasonably cautious man to believe that the danger was actual and the necessity real, in order that the slayer may be justified in acting upon his own belief to that effect.

5. Evidence examined and found sufficient to support the verdict for murder in the second degree.

Writ of error to the Circuit Court for Bradford county.

The facts in the case are stated in the opinion of the court.

*John E. Hartridge* and *Wills & Long*, for Plaintiff in Error.

*The Attorney General*, for Defendant in Error.

CARTER, J.:

Plaintiff in error was indicted for murder in the first degree at the Fall term, 1894, of the Circuit Court for Bradford county. During a subsequent term held in March, 1899, he was arraigned and pleaded not guilty. Upon the trial had at the same term he was found guilty of murder in the second degree, and from the sentence imposed sued out this writ of error.

1. The first assignment of error relates to the ruling of the Circuit Court whereby it refused defendant's motion to compel the State Attorney to call as witnesses for the State, all the persons whose names were endorsed upon the indictment and who were shown by the

ruling is fully sustained by the decision of this court in Selph v. State, 22 Fla. 537.

2. The second assignment of error reads as follows: "The court erred in giving the charges numbered five and ten as appears on pages 37 and 38 of the record." This assignment is general, embracing more than one instruction given by the court. These instructions assert distinct propositons of law, and under our rulings we will examine no further than to ascertain that one of them was properly given. Shiver v. State, decided at the present term, and authorities therein cited. The instruction numbered 5 complained of was substantially in the language of our statute defining murder in the second degree, and it was preceded by others defining justifiable and excusable homicide and murder in the first degree, and succeeded by others defining manslaughter, premeditated design and the right of self-defense, and the jury were told that if the evidence warranted it, they might convict the defendant of murder in one of its degrees, or manslaughter. The instruction was as follows: "The unlawful killing, when perpetrated by an act eminently dangerous to another and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual, is murder in the second degree." The objection urged is, not that it asserts an incorrect proposition of law, but that it was not applicable to any phase of the evidence. Inasmuch as we hold that the evidence was sufficient to sustain the verdict for murder in the second degree, it is quite evident that this instruction was applicable to the evidence and that the court committed no error in giving it.

3. The third assignment of error reads as follows:

"The court erred in refusing to give the charges numbered from four to twenty inclusive, as requested by plaintiff in error as appears on pages 38 to 48 inclusive, of the record." This assignment is also general, embracing seventeen instructions refused. Many of these proposed instructions assert distinct propositions of law, and according to the authorities cited *supra* we examine no further than to ascertain that one of them was properly refused. The sixth is as follows: "The killing of a human being without the authority of law, by poison, shooting, stabbing or any other means, is either murder, manslaughter or excusable or justifiable homicide according to the facts and circumstances of each case. I therefore charge that under the statute of Florida in reference to homicide it is not enough to show that the homicide is unlawful. The State must prove to you beyond a reasonable doubt that the homicide was not only unlawful, but the burden of proof is on the State further to show that according to the facts and circumstances of the case the homicide was also not justifiable or excusable." This instruction was properly refused because it "puts the burden upon the State of negativing beyond a reasonable doubt defensive matter, the burden of affirmatively showing which is upon the defendant, and that, too, whether the defendant affirmatively establishes such matter by proof or not." Padgett v. State, 40 Fla. 451, 24 South. Rep. 145.

4. The remaining assignments of error, based upon the order overruling defendant's motion for a new trial, question the sufficiency of the evidence to support the verdict found. The State examined four witnesses, two only of whom claimed any knowledge of the facts attending the homicide. The defendant offered no testimony. It appears from the State's evidence that at the

time of the homicide the defendant was sixteen or seventeen years of age, and the deceased Samuel Hilliard about fifty-five years of age, somewhat taller and a little heavier than defendant. None of the witnesses knew of any illwill between the parties. The homicide occurred between twelve and one o'clock May 21, 1894, and about two hours prior thereto the deceased and his adult son Marion were in the latter's field when the defendant approached them and asked Marion to fight him. Marion told him he had done nothing for defendant to fight him for, that he had been sick for a week and that defendant was a minor, but the latter would make no reply except "you have got me to fight." During the same morning, whether before or after this conversation is not stated, the defendant told one John Whitehead that he and Marion Hilliard were to meet at twelve o'clock, at a certain place in the woods near a neighborhood road, about half way between where deceased and defendant lived, for the purpose of having a fair fight, and requested Whitehead to go with him as his friend. Whitehead and one Henry Tison had started to the appointed place when they met defendant who said he had started back after them. These parties all went to the appointed place and Whitehead and Tison sat down at the root of a tree. Shortly afterward deceased came up and asked "is this the place for the battle?" Defendant replied "this is the place." Deceased said to defendant "I think you had better drop this at what it is," and turning to Whitehead inquired "don't you think so, Whitehead?" to which the latter replied "yes, I think it would be best." The defendant thereupon cursed the deceased, applying to him one of the vilest and most opprobrious epithets known to our language, whereupon deceased cursed defendant, ran

his hand in his pocket, took out his pocket knife, opened
it and started toward defendant, remarking that he could
not take that. Defendant told him to stop or he would
shoot him, and deceased stopped, he and defendant con-
tinuing to curse each other. Deceased started toward
defendant again, was ordered to stop on pain of being
shot, and stopped again, each party continuing to curse
the other. Deceased started toward defendant again,
was ordered to stop by defendant who simultaneously
fired at him with a pistol, striking him in the left corner
of the mouth, inflicting a mortal wound from which he
almost instantly died. Whitehead, Tison and Henry
Philips, a stepson of the deceased, were present, none
of them taking any part in the difficulty. At the time
the shot was fired Whitehead was almost exactly be-
tween the defendant and the deceased, Henry Philips
was standing to the right of Whitehead about thirty
feet away, and Tison was sitting down "right off to the
left" of him. Defendant did not move from the time he
first cursed deceased until after the shooting. When the
cursing first began Whitehead was nearly between the
parties, the deceased being ten or twelve feet from him,
while defendant was standing a little to the right, but
behind him. Deceased only advanced one step each
time that he was commanded to stop and when the pis-
tol fired he fell forward, his head striking the ground
about five or six feet from Whitehead.

Plaintiff in error contends that under the facts he
was justified in killing the deceased on the ground of
self-defense; that if the homicide was unlawful, it was
not perpetrated by an act "imminently dangerous to
another, evincing a depraved mind regardless of human
life," so as to bring it within the definition of murder
in the second degree.

1st. Under Section 2378, Revised Statutes, homicide is justifiable when committed in the lawful defense of the person committing it "when there shall be a reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished." While the danger need not be actual, nor the necessity to kill real, yet the circumstances surrounding and as they appear to the slayer at the time he does take life, must be such as would induce a reasonable cautious man to believe that the danger was actual, and the necessity real, in order that the slayer may be justified in acting upon his own belief to that effect. Smith v. State, 25 Fla. 517, 6 South. Rep. 482; Pinder v. State, 27 Fla. 370, 8 South. Rep. 837; Lovett v. State, 30 Fla. 142, 11 South. Rep. 550. Aside from any question as to who was the aggressor in this difficulty, and even admitting that the deceased designed to do defendant some great bodily injury, we are of opinion that the jury were justified in finding from the evidence that there was no real or apparent imminent danger of such design being accomplished. The hesitancy with which the deceased advanced in the face of warnings backed by a show of arms, the distance from which the shot was fired, at least eight or ten feet, the fact that the defendant's friend was between the two men, all tend to show that defendant was exceedingly hasty and fired before there was any real or apparent necessity to do so, and before danger to him became really or apparently imminent.

2nd. If the defendant perpetrated the unlawful homicide from a premeditated design to effect the death of the deceased or any human being, he would have been guilty of murder in the first degree; but if he perpetrated it by an act imminently dangerous to another, evincing

a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, he would be guilty of murder in the second degree. Whether such design existed or not was a material question of fact to be determined by the jury, and their finding must necessarily have been based upon inferences or deductions drawn from all the facts shown in evidence. The jury either inferred that there was no premeditated design or the evidence failed to produce in their minds an "abiding conviction to a moral certainty" that such design did exist. Plaintiff in error admits that the evidence did not prove a premeditated design and that the jury properly acquitted him of murder in the first degree. The killing was, therefore, perpetrated without a premeditated design to effect the death of any particular individual, and, as we have seen, it was unlawful. Was it perpetrated by an act imminently dangerous to another? The evidence shows that the act, the discharge of a loaded pistol at deceased, at the distance of a few feet, was necessarily and essentially of that character. It was not only imminently dangerous to another—the deceased—but also to others, for the defendant's friend was nearly between the parties, and must have been very nearly in range of the bullet. Did the act evince a depraved mind, regardless of human life? We think the evidence was such that the jury could lawfully so find. Defendant armed himself with a deadly weapon and repaired with his friends to an appointed spot to have a "fair fight" with Marion Hilliard. The latter did not meet his engagement, but instead his father, against whom defendant entertained no illwill, appeared upon the scene, evidently as a peacemaker, and appealed to defendant and his friend to let the matter drop. The defendant thereupon, without the

slightest insult or provocation, calmly and deliberately, and not in passion, applied to one against whom he had no illwill one of the most grossly insulting epithets in the English vocabulary. When the deceased attempted to resent it, in a manner not lawful, it is true, the defendant informed him that he would shoot if he did not stop, and before the danger of injury to the defendant was imminent or apparently so, without exhibition of any violent passion, and without moving out of range of his own friends, he fired at deceased the shot for the fatal consequences of which this indictment was found against him. This was, we think, sufficient evidence for the jury to find that the act evinced a depraved mind regardless of human life. Marshall v. State, 32 Fla. 462, 14 South. Rep. 92; Hogan v. State, 36 Wis. 226; Giskie v. State, 71 Wis. 612, 38 N. W. Rep. 334; Frank v. State, 94 Wis. 211, 68 N. W. Rep. 657.

The foregoing statement of the facts attending the homicide we have taken from the testimony of John Whitehead, one of the State's witnesses, but another witness for the State, Henry Philips, testified that deceased had no knife on that occasion, and did not curse the defendant. If his version of the affair is correct, there can be no doubt that a verdict for murder in the second degree is fully sustained by the evidence.

From what has been said in this opinion we do not wish it to be inferred that we intend to hold that danger to many or others is, under our present statute (Section 2380, Revised Statutes), an essential to murder in the second degree, or that proof of an intent to kill a particular individual will exclude a conviction for murder in that degree, for we are in thorough accord with our previous decisions in Marshall v. State, *supra*, and McCoy v. State, 40 Fla. 494, 24 South. Rep. 485, announcing

the opposite view. See, also, Hogan v. State, *supra*. The verdict of the jury is not contrary to the law, the evidence or the charge of the court, consequently there was no error in overruling the motion for a new trial.

This disposes of all the questions raised by the assignments of error, and, finding no error, the judgment of the Circuit Court is affirmed.