WILL BOYKIN, *Plaintiff in Error*, v. THE STATE OF FLOR-
IDA, *Defendant in Error*.

Opinion Filed July 5, 1920.

1.  Where there is some substantial competent evidence of all
    the facts legally essential to support the verdict and there is
    nothing in the record to indicate that the jury was not gov-
    erned by the evidence a refusal of the trial court to grant a
    new trial on the ground of the insufficiency of the evidence
    to support the verdict will not be disturbed by an appellate
    court.

2.  A verdict of guilty of assault with intent to commit murder
    in the second degree upon a charge of assault with intent to
    commit murder in the first degree will be sustained if the
    evidence shows an assault with intent to commit murder in
    the first degree or in the second degree as defined in the
    statute, sinec the latter offense is regarded as being in-
    cluded in the former.

A Writ of Error to the Circuit Court for Santa Rosa
County; A. G. Campbell, Judge.

Judgment affirmed.

*W. W. Clark,* for Plaintiff in Error;

*Van C. Swearingen,* Attorney General, and *D. Stuart
Gillis,* Assistant, for the State.

WEST, J.—This case involves a question of evidence and
certain principles of law well settled in this jurisdiction.

Plaintiff in error, Will Boykin, was indicted and tried
upon a charge of assault with intent to commit murder
in the first degree. He was found guilty of assault with

intent to commit murder in the second degree.  From
the sentence imposed he took writ of error.

There is a single assignment of error.  It challenges
the soundness of the order of the court overruling de-
fendant's motion for a new trial.  The grounds of the
motion for new trial are (1) that the verdict is contrary
to law and not authorized under the indictment; and (2)
that the verdict is contrary to the evidence and not sup-
ported by it.

The person upon whom the assault is alleged to have
been made is Sam Bellamy.  At the trial Bellamy testi-
fied: "My name is Sam Bellamy; I live out on the hill,
just this side of Mr. Rhoda's.  I know Will Boykin; I
have known him something over 15 years.  He and I had
some little trouble about the 15th of last September, last
year.  It was over at the mill—the Mayo Mill.  The
trouble was, I was running the edger and he was running
the rollers; I got fouled in the lumber and I run over
there and asked him to stop the rollers until I could get
it unfouled; he said no, he was not going to stop it; he
said it was none of my business.  I asked him to stop it
until I could get unfouled.  I said that was no way to do,
I said you just naturally contrary and too bigoted, I sees
Mr. Whitmire coming and turns to go back to work and
he strikes me with this pick.  This is where he hit me.
I will show it to the jury, that is where he hit me.  Made
that hole right there.  There is a place in there the doc-
tor says, yes sir, the doctor had to put in a plate.  Doc-
tor Payne treated it for me at the Pensacola Hospital. He
hit me with that pick over there.  Yes, sir.  That is the
same pick, I have seen it over there.  I don't know how
he hit me—I won't be so sure about that, Dr. Carter said
he stuck it in, he waited on me, he took me to Pensacola,

he said he stuck it in. Didn't go that way—stuck it in this way."

Perry Whitmire, for the State, testified: "My name is Perry Whitmire, I live in Milton here. I know Sam Bellamy and Will Boykin. I was out at the Mayo Mill at the time they had some trouble some time last September. I was somewhere about thirty feet away when they had the trouble. I first noticed it about a minute, I guess, before I saw Sam with his head split. I saw Sam talking to Boykin. I didn't know there was any trouble between them. He was leaning over some pieces of lumber two or three feet apart. The lumber comes out here (indicating) Sam was at the edger. Sam Bellamy had his hands on his lumber on his side and Will was standing on the other side of Sam's lumber talking to him. I suppose Sam's boards were about that high. Well, I made a step to another fellow and I looked around and saw Bellamy coming with his head split, and I saw Boykin coming with a lumber pick in his hand."

Douglass Collins, for the State, testified: "My name is Douglass Collins. I live across the river. I know Sam Bellamy and Will Boykin. I knew them both about the 20th day of September, last year; I was down at the Mayo Mill at the time they had that little trouble. I was about twenty or twenty-five feet from them. Well, I was about as far from them as from me to where that man is standing in the jail (indicating). The first thing I noticed him and Will was standing up there talking. I didn't see Sam doing anything to him. Sam didn't do anything to him—Sam went to turn and Will hit him with the pick. He was kind of turned sideways to him, he hit him kind of this way. I didn't notice which way the pick was turned. I think he hit him with the back of it—I thought

he did. Sam staggered on across the mill. Will run over there to him. Sam staggered across the mill and Will run over there to him where he was at. Will jumped back from him then and Sam run around and picked up the axe. About that time I couldn't see them for a while because they were back of the edger and then Will came around—I didn't see him any more until he came further around the edger and came around the buttonsaw.. That is where Brown was. I didn't see Sam doing anything to him at all, hitting him or slapping him. I didn't see him do anything to him at all—I didn't see him strike him at all. Didn't see him make any demonstration towards him at all. After they washed the blood off of him Sam went back to the button saw. There was an axe lying there and Sam picked up the axe then and started towards Will, where he was working, and then Will taken both the picks and jumped up on the roller bed."

The physician, Dr. Albert Carter, who examined the wound inflicted, testified: "My name is Albert Carter. I am a physician, I am engaged in the actual practice of medicine and surgery. I know Sam Bellamy, been knowing him for several years. I remember the time when it was said he was struck by a man named Will Boykin. I examined his head at that time. The wound was in the right temporal region. I think it was on the right side. It was a lacerated, contused wound, involving two layers of bone and went into the brain. It showed that it was made with a sharp instrument—it was a punctured wound, it was done with a sharp instrument. The nature of the wound showed that it could have been made with an instrument such as this (referring to pick, which was exhibited to witness.)"

Ernest Cross, the first witness in behalf of defendant,

testified: "My name is Ernest Cross. I know these two darkies, Will Boykin, and Sam Bellamy. I was working down at the mill at the time they had the difficulty. I was working over about sixty feet from Will Boykin's place of work—something like that. Yes, sir, a little bit longer than this courtroom. Around sixty feet is the nearest I can guess at it. Will Boykin and Sam Bellamy worked about ten feet apart. The first thing I noticed between them was—just before the trouble began—Bellamy got up and walked from his job and was shaking his finger in his face and he turned around to walk off— well he turned around—I don't know whether he turned around to walk off or not, and Will hit him. The mill was making a noise. As Will struck him he shoved him on around, followed him on around the edger. He turned around and came back there and stopped and Bellamy picked up an axe and started after him that way and two or three more boys got in across there and then Bellamy started off this way (indicating), this end of the mill."

There is other evidence to the same effect. It appears in the testimony of plaintiff in error that there had been trouble before this time between him and Bellamy, and the jury may have concluded that there was still bad blood between them.

No benefit would be derived from an attempt to follow in this opinion the interesting discussion of counsel with respect to the legal principle which he conceives to be involved.

The frequently reiterated rule is that where there is some substantial competent evidence of all the facts legally essential to support the verdict and there is nothing in the record to indicate that the jury was not governed by the evidence a refusal of the trial court to grant a new

trial on the grounds of the insufficiency of the evidence to support the verdict will not be disturbed by an appellate court. Messer v. State, 75 Fla. 619, 78 South. Rep. 680; Barrentine v. State, 72 Fla. 1, 72 South. Rep. 280; McClellan v. State, 66 Fla. 215, 63 South. Rep. 419; Smith v. State, 66 Fla. 135, 63 South. Rep. 138.

It is equally well established here that a verdict of guilty of assault with intent to commit murder in the second degree upon a charge of assault with intent to commit murder in the first degree will be sustained if the evidence shows an assault with intent to commit murder in the first degree or in the second degree as defined in the statute, since the latter offense is regarded as being included in the former. Sec. 4007, Gen. Stats. 1906, Compiled Laws 1914; Grace v. State, 78 Fla. 486, 83 South. Rep. 271; Jones v. State, 75 Fla. 533, 82 South. Rep. 777; Feagle v. State, 55 Fla. 13, 46 South. Rep. 182; McCoy and Thomas v. State, 40 Fla. 494, 24 South. Rep. 485.

There is sufficient basis in the evidence for a verdict either upon the theory that plaintiff in error was guilty of assault with intent to commit murder in the first degree or in the second degree, and an application of the foregoing principles results necessarily in an affirmance of the judgment.

The judgment will be affirmed.

BROWNE, C. J., AND TAYLOR, WHITFIELD AND ELLIS, J. J., concur.