TOM AMMONS, *Plaintiff in Error*, v. THE STATE OF FLOR IDA, *Defendant in Error*.

Division A.

Opinion Filed December 16, 1924.

1. In the trial of an indictment for murder a verdict of murde in the second degree will not be disturbed if the evidenc is sufficient to sustain a verdict for the higher degree c unlawful homicide.

2. There are two phases of the law of self defense as defind by our statute: First, one may resist the attack of anothr to the extent of taking the life of such other person wha the latter is attempting to murder the former or commt any felony upon him; second, when one is lawfully defeni- ing oneself where there is reasonable ground to appreherl a design in the attacking party to commit a felony or to o some great personal injury to the slayer and there shall e imminent danger of such design being accomplished.

3. In the prosecution of an indictment for murder where tle defendant sets up the defense of self defense in that he w.s defending himself against an attack by the other to commt a felony and there was imminent danger of the design beilg accomplished, the question of apprehension by the defendat of danger is for the jury and the circumstances as they ap- pear to the defendant must be such as would induce a ra- sonably prudent or cautious man to believe that the danger was actual and the necessity for taking life real.

4. Men do not hold their lives at the mercy of excessive cuu- tion or unreasonable fears of others.

5. The court will not declare as a matter of law that when two men are in a heated controversy one of them puts his hand on his hip pocket that such act creates in the other justification for taking the life of the former.

6. Where, in a prosecution of an indictment for murder, the evidence is sufficient to sustain a verdict of murder in the first degree the defendant may not complain that it was more than sufficient to sustain a verdict 'of murder in the second degree of which he was convicted.

7. Where exceptions are taken in a motion for a new trial to the court's refusal to give requested instructions such motion should be evidenced to this court by a bill of exceptions.

8. Exceptions should be taken to the identical portion of a charge which is assigned as error. When the exception is taken to the entire charge, if there is a single correct proposition contained in the charge given the entire charge given will be sustained.

9. Exceptions to refusals to charge the jury as requested must be taken at the time of such refusals. They cannot be taken to the ruling on a motion for a new trial based 'on such refusal.

10. In a trial for murder in the first degree an instruction upon the law of self defense should be so framed as to inform the jury that the defendant cannot justify the killing unless he had reason to believe and did believe that it was necessary to save his own life or to save himself from great personal injury when his defense is upon that phase of the law of self defense.

11. Evidence examined and found sufficient to sustain the verdict.

A Writ of Error to the Circuit Court for Broward County; C. E. Chillingworth, Judge.

Judgment affirmed.

*Brown & Stokes* and *McCune, Weidling & Hiaasen,* for Plaintiff in Error;

*Rivers Buford,* Attorney General, and *J. B. Gaines,* Assitant, for the State.

ELLIS, J.—The plaintiff in error, Tom Ammons, to to whom reference will hereinafter be made as the defendant, was indicted for the murder, on December 30, 1923, of W. T. Williams and on March 20, 1924, convicted of murder in the second degree. He seeks reversal of the judgment on Writ of Error.

The facts in the case, which the evidence tends to prove, may be briefly stated. The deceased, who operated a small farm, had employed the defendant to manage it or work upon it upon terms. A disagreement had arisen between them out of which litigation had grown resulting in ill feeling between the parties.

The defendant claimed that the deceased owed him money on account of their transactions and the deceased had refused to come to a settlement.

The latter had on several occasions previous to the day of the homicide made disparaging remarks about the defendant; had threatened to kill him or run him out of the community or ruin him financially. These boastful, ill-advised, scandalous remarks were promptly carried to the defendant by mutual friends. Three or four days before the homicide the wife of the defendant, according to her testimony, met, on the street, the deceased, whom she had known for several years and who had always spoken to her, "raised his hat" respectfully, and with whom she had never had any "unpleasant relations." Upon meeting him on this occasion, however, when she spoke to him in passing, as she usually did, he met her pleasant sidewalk salutation with the request that she

"kiss his ass," which seems to have been interpreted to
mean that part of his anatomy designated by a different
word, called her a "damn whore," requested her not to
speak to him and informed her that he was going to get
that husband of hers if "I have to kill him or run him
out of the country." This insult to her and threat against
her husband she did not promptly relate to him but kept
back the information for several days. While she testified
to this state of facts she also told the sheriff and a deputy
soon after the homicide that she had not seen Mr. Williams
in a week or ten days and had not been "down the street
in three or four days."

Upon the day of the homicide Mrs. Ammons told her
husband, so she testified, of her meeting the deceased and
his language to her. The information was imparted to
defendant that night at home in, or near, Fort Lauder-
dale. He came home after dark, between which time and
the homicide she imparted to him the information.

The defendant being "short of cigarettes" went down
town to get some. He went in an automobile. Passing
near the Gilbert Hotel he saw a Mr. Padgett and stopped
the car to speak to him. But he also saw the deceased on
the sidewalk in front of the hotel and deferring his conver-
sation with Mr. Padgett in order to speak to Mr. Williams,
the defendant, who was armed with a pistol which he
usually carried in his car, got out of his car, passed Mr.
Padgett with a friendly salutation and going up to Mr.
Williams, said: "Poker Bill" or "Billie Williams, you
want to see me. I am right here," and repeating that
statement applied to the deceased a vile epithet and shot
him. The deceased backing away from the defendant got
behind a barber pole as if he was trying to "catch some-
thing" or "grasp the pole." The defendant fired five
shots; the first two or three made a smoke in front of the

defendant, and stepping forward out of the smoke he fired again. Then going up to the deceased, who was behind the barber pole, struck him over the head with the pistol. The deceased was not armed but had in his pocket two pocket knives.

The defendant's account of the shooting is slightly different. He said that Williams had threatened, at least three times, to kill him but had never made any attempt to do so; that *they* had talked on other occasions and nothing happened. That bad relations had existed between them for about a year. The day of the shooting the defendant's wife told him of Mr. Williams' threat to run defendant out of town and of Mr. Williams' offensive language to the defendant's wife. That seeing Mr. Williams on the street that night defendant got out of his automobile and walking up to Mr. Williams said: "Mr. Williams, my wife tells me you want to see me, and you want to get me, is that right? I want to know why you called her a damn whore and told her to kiss your ass." That deceased then "turned around to me," he said, "You damned son of a bitch, and he ran his hand under his coat to his hip pocket and he turned around." "I thought he was going to shoot me and I pulled my pistol and commenced shooting." The defendant said, because "Mr. Williams had made threats against my life on about three or four occasions before this and that was the reason I thought he was going to shoot me."

The defendant did not go down town that night for the purpose of meeting the deceased. The deceased had said that he carried a pistol "all the time." The defendant knew that the "first three shots" he fired had struck Mr. Williams. The defendant "pulled his gun" before he thought he "saw one on" Williams. He thought he saw one in the right hand of deceased after the defendant "had

shot three times.'' The defendant believed he was ''nor-
mal'' when he approached Mr. Williams that night. His
reason for shooting Williams was when the latter put his
hand to his pocket defendant ''thought (Williams) was
going to shoot.'' Defendant said he had not planned to
kill Williams, that he was not ''mad'' and did not feel
like killing him when he spoke to him. Soon after the
shooting, however, the defendant told a deputy sheriff,
Mr. Hicks, that ''I put five bullets into the son of a bitch
and I would put five more if I had him, any man that
would try to get away with what he got away with'' and
then repeated the alleged insult to his wife, and said that
was the reason he shot the deceased.

Counsel for the defendant say in their brief: ''If the
defendant's account of the killing is not supported by evi-
dence; if the defendant's defense of self-defense is not
supported by evidence it leaves the defendant nothing to
stand on and it was cold-blooded, deliberate, premeditated
murder and he should have been convicted of murder in
the first degree.''

Our examination of the evidence forces the conclusion
upon us that both accounts of the killing of Williams by
the defendant, taken separately or collectively, showed the
transaction to have been murder.

The defendant's account of the killing is in no partic-
ular similar to the facts in the case of Holton v. State, 87
Fla. 65, 99 South. Rep. 244. In that case the deceased,
who had threatened Holton's life, came to the latter's
house the morning of the shooting armed with a pistol,
waited for the defendant to return from hunting, accused
him of stealing a whiskey still, called the defendant a liar
when the latter denied the charge and fired at him with
the pistol. The defendant replied with a shot from his
shotgun. The Court said: ''We cannot say that there

15—Vol. 88.

exists in this case any fact or circumstance which can be said to refute the statement of the defendant as to the details of the affair.'' If such statement ''was a true account of the transaction, we do not agree with the conclusion of the jury that it was murder in the second degree. We think the evidence as a whole fails to support the verdict.''

The evidence for the State in the case at bar, as well as the defendant's confession to Mr. Hicks, is ample to sustain a verdict of murder in the first degree. The defendant's account of the transaction, eliminating therefrom his statement as to what his belief was concerning the intentions of the deceased when the latter put his hand under his coat, a fact unsupported by any evidence except the defendant's statement and inferentially contradicted by other witnesses, is alone sufficient to support the indictment.

The statement of facts in the case of Faust v. State, 78 Fla. 591, 83 South. Rep. 398, is not full enough to make an accurate comparison between that case and the one at bar although it does appear in the Faust case that the deceased, who was going to his work, was in the road near the defendant's house. An altercation between the two arose; the deceased returned to his home, ''got his gun, and was again going along the road towards defendant's house, when he was fatally shot by the defendant, before he got opposite defendant's house, and before deceased attempted to shoot—the defendant having gone into his house and gotten his gun as the deceased returned.''

By a divided Court it was held that a ''premeditated design'' on defendant's part ''to effect the death of the deceased'' did not ''appear, as the verdict indicates.''

The case of Francis v. State, 62 Fla. 54, 57 South. Rep. 230, is not analgous. The facts in that case are fully

stated, from which it appeared to the court that murder in none of its degrees was shown and that if the evidence did not establish self-defense it made out no greater crime than manslauhgter.

In the case at bar the evidence for the State tends clearly to establish the crime of murder in the first degree. What reason impelled the jury to return a verdict of murder in the second degree need not be inquired into, as a verdict of murder in that degree will be sustained if the evidence would support a verdict of a higher degree of homicide. Because the defendant's guilt as to every grade of unlawful homicide is involved upon a trial for murder in the first degree. See Clemmons v. State, 43 Fla. 200, 30 South. Rep. 699; Boykin v. State, 80 Fla. 200, 85 South. Rep. 651; Brown v. State, 31 Fla. 207, 12 South, Rep. 640; McCoy v. State, 40 Fla. 494, 24 South. Rep. 485; Morrison v. State, 42 Fla. 149, 28 South. Rep. 97; Bellamy v. State, 56 Fla. 43, 47 South. Rep. 868; Section 6110 Revised General Statutes 1920.

The defense in this case was that the killing of Williams was not unlawful, that it was justified by the law of self-defense.

In support of that defense the defendant said that when he spoke to the deceased the latter applied an insulting epithet to the defendant, put his hand under his coat to his hip and defendant thought the deceased intended to shoot him, as the deceased had previously on several occasions threatened to kill the defendant.

Homicide is defined by the statute to be justified when committed while resisting any attempt to murder the person who kills, or to commit any felony upon him, or when committed in his lawful defense where there shall be a reasonable ground to apprehend a design to commit a felony or to do some great personal injury and there shall

be imminent danger of such design being accomplished. Section 5033 Revised General Statutes 1920.

It is apparent from the reading of the statute that there are two phases to the law of self-defense, so far as that statute is applicable here.  First, when one is attempting to murder another or to commit any felony upon him the person so attacked may resist to the extent of taking the life of the other; second, when one is lawfully defending oneself, where there is reasonable ground to apprehend a design in the attacking party to commit a felony or to do some great personal injury to the slayer and there shall be imminent danger of such design being accomplished.

The first phase of the law of self-defense is not sought to be applied in this case, nor indeed could it be because no fact or circumstance exists, testified to by either State's or defendant's witnesses, showing that the deceased was attempting to murder the defendant or to commit any felony upon him.  The defense rests upon the theory that the defendant killed the deceased while the former was in the lawful defense of himself, having reasonable grounds to apprehend a design on the part of the deceased to commit a felony or to do some great personal injury to the defendant there being imminent danger of such design being accomplished.

The confession of the defendant to the deputy sheriff, Hicks, is a complete refutation of such theory.  It shows that the defendant killed Williams because of the latter's insult to the former's wife.  Yet the defendant in his testimony said that he was not excited when he spoke to Williams, that he said nothing to offend him, had no "idea of seeing him that night," did not expect to have any trouble with him; was not afraid of him and expected nothing from the deceased but words and "didn't expect anything but talk with him to keep from having trouble."  According

to his testimony, however, the defendant drew his pistol and fired at the deceased before he thought he saw a pistol in the hand of the deceased. ·

Assuming that the defendant's account of the transaction was true, it seems to present this kind of a question. Is one justified under the law of self-defense, as defined in this State by statute, in taking the life of one because that one had made threats against the slayer to kill him or run him out of town, although on previous occasions after such threats when the parties met the slain had made no demonstrdations towards putting the threat into execution, but at the last meeting applied a vile epithet to the slayer and put his hand on his hip pocket?

If the defendant merely sought an interview with the deceased, merely wanted him to explain his language addressed a few days before to the defendant's wife, it cannot be said that such attiude constituted the beginning of a difficulty nor that the deceased was guilty of any wrong in bringing it on. In such case, did the use of a vulgar epithet applied to the defendant by deceased and the latter's motion of his hand toward his hip pocket justify the defendant in killing him?

We think it did not. While the danger to defendant in this case was not real, as there was no evidence that the deceased was armed with a pistol, the question is: were the circumstances as they appeared to the defendant such as would induce a reasonably prudent or cautious man to believe that the danger was actual and the necessity real? See Smith v. State, 25 Fla. 517, 6 South. Rep. 482; Pinfer v. State, 27 Fla. 370, 8 South. Rep. 837; Alvarez v. State, 41 Fla. 532, 27 South, Rep. 40; Morrison v. State, 42 Fla. 149, 28 South. Rep. 97; Lane v. State, 44 Fla. 105, 32 South. Rep. 896; Barnhill v. State, 56 Fla. 16, 48 South. Rep. 251.

The question of apprehension of danger was for the jury. Harris v. State, 75 Fla. 527, 78 South. Rep. 526. It is a question of fact, not of law, to be gathered by the jury from all the circumstances of the case. It is for the jury to say, all the circumstances considered, whether a reasonably prudent and cautious man would have believed himself in danger of death or great harm from deceased, not for the court to say as a matter of law that certain facts create such apprehension in a reasonably cautious and prudent person. See Ward v. State, 75 Fla. 756, 79 South. Rep. 699.

The defendant may have believed that the deceased had a pistol and by placing his hand upon his hip pocket under his coat intended to draw the weapon and fire upon the defendant, but the jury evidently thought that under the circumstances such fear or belief was not a reasonable one. It has been said that men do not hold their lives at the mercy of excessive caution or unreasoning fear of others, and such language has been approved by this Court.

If such was defendant's motive and there was no real nor apparent good reason for his doing so, the defendant cannot justify his act as being in self defense. Morrison v. State, *supra.*

There was no real danger. The deceased was not armed. If he had ever made threats against the life of defendant he had never attemped to carry them out. The jury evidently did not believe the defendant's statement that the deceased apparently attempted to draw a pistol. Even if the deceased put his hand upon his hip pocket, this Court will not say as a proposition of law that such an act constitutes an assault with murderous intent or creates a reasonable apprehension that danger to another's life is imminent. The defendant was prepared for a shooting; he was armed with a deadly weapon; he sought the deceased, and drawing

his pistol before he thought he saw one in the hand of deceased fired to kill.

The evidence was ample to support a verdict of murder in the first degree and the defendant cannot claim reasonably to be injured by the verdict because the evidence was more than sufficient to convict him.

Other assignments of error relate to the court's refusal to give certain instructions to the jury as requested by the defendant's counsel. . Nine instructions were requested; all but the first were refused.

An exception was taken to the charges given and denied. That is to say one exception taken covering all charges given and all denied. The motion for a new trial through which exception was attempted to be made to the court's refusal to give the requested instructions is not evidenced to this court by the bill of exceptions as the rule requires.

Exception must be taken to the identical portion of the charge which is assigned as error. When an exception is taken to the whole charge, if there is a single correct proposition contained in the charge given the entire charge given will be sustained. See Metzger v. State, 18 Fla. 481; Carter v. State, 20 Fla. 754; Pinson v. State, 28 Fla. 735, 9 South. Rep. 706; Wood v. State, 31 Fla. 221, 12 South. Rep. 539; Thomas v. State, 47 Fla. 99, 36 South. Rep. 161; Ewert v. State, 48 Fla. 36, 37 South. Rep. 334; Maloy v. State, 52 Fla. 101, 41 South. Rep. 791.

The same rule applies to charges requested and denied and an exception taken en masse. See Metzger v. State, supra; Griffin v. State, 48 Fla. 42; 37 South Rep. 209.

Exception to refusal to charge must be taken at the time of such refusal. It cannot be taken to the ruling on a motion for new trial based on such refusal. See Shepherd v. State, 36 Fla. 374, 18 South. Rep. 773; Lester v. State, 37 Fla. 382, 20 South. Rep. 232; Thomas v. State, 49 Fla.

123, 38 South. Rep. 516; Clark v. State, 59 Fla. 9, 52 South. Rep. 518; Mathis v. State, 70 Fla. 194, 69 South. Rep. 697.

In view of the gravity of this case—that a man was placed on trial for his life charged with the murder of another—we reviewed and discussed the evidence that is presented by a bill of exceptions, although under the rule no exception to its sufficiency to sustain the verdict was properly presented to this court. We do not regard it to be necessary, however, to further condone such disregard for the rules by considering in detail the charges given and refused. We have examined those given and find no error in them and we have also examined those refused and find that they were properly refused; not only because those propositions which are deemed to be correct and were included in some of the instructions refused were fully covered by the general charge, but because other requested instructions announced incorrect propositions of law. "In a trial for murder in the first degree, an instruction upon the law of self defense should be so framed as to inform the jury that the defendant could not justify the killing unless he had reason to believe *and did believe* that it was necessary to save his own life or to save himself from great personal injury." See Barnhill v. State, *supra;* Linsley v. State, 88 Fla. 135, 101 South. Rep. 273.

Other assignments based upon objections to certain proceedings and rulings taken and made by the court contain no merit.

We have, as stated, in view of the serious nature of the crime charged in this case, considered it upon its merits although the record was not prepared in accordance with the rules which have been prescribed, promulgated and construed by this Court and which were adopted with the end in view to obtain a clear, succinct presentation of cases to the end that justice may be administered expedi-

tiously and as inexpensively as is consistent with efficiency. We venture to express the hope, however, that in future the rules of court in the preparation of transcripts of the record and assignments of error will be more closely followed.

We do not say this in a spirit of unfriendly criticism of the able counsel engaged in this case because to such members of the bar the court and the people depend for the efficient functioning of the judicial system.

We have discovered no error in the record, so the judgment is affirmed.

TAYLOR, C. J., concurs.

BROWNE, J., concurs in the affirmance.

WHITFIELD, P. J., AND WEST AND TERRELL, J. J., concur in the opinion.