ALLEN, Chief Judge.
The appellant was convicted February 26, 1959, on an information charging him with murder in the second degree. The motion for new trial was denied and he was sentenced to a term of 25 years in the State Prison, which judgment and sentence was appealed to this court.
The defendant below, appellant here, went to the home of Moses Harris on Sunday afternoon, December 7, 1958, at approximately 4:45 o’clock to give Harris a receipt for his rent money. He went into the house and found Harris sitting at the dinner table with one Moses Watts eating some chicken. The defendant asked Harris for a piece of chicken and at the same time gave Harris the rent receipt. Harris got up from the table and walked over to the opposite wall to deposit the receipt in a bag kept for that purpose. In the meantime the defendant sat down in Harris’ chair and commenced eating some chicken. Harris’ wife, Katherine Harris, was across the room cooking dinner.
While Horne was eating he began telling Watts, the deceased, how he, Horne, would like to carry on with Harris’ wife. Whereupon Watts became indignant and asked, “you go on like that in front of his wife ? ” and the defendant answered, “Us do that all the time.”
Katherine Harris testified that the defendant continued talking about carrying on with her to Watts when Watts stated, “Just so you don’t tell me that,” and Horne, the defendant, answered, “Well I wasn’t talking to you, I’m talking to him.” Moses Watts then said, “A little nigger like you come in my house and ask about something to eat, I’d whup you.” Upon direct examination, Katherine Harris testified as follows in regard to the actual shooting:
“Q. Just tell us what happened, if you know. A. Yes, he was telling my husband where to kiss, and this other man took it up, and so Horne said T ain’t talking to you’ and so it kept on and kept on, he did, and he say ‘You got more to do with it than I have, I ain’t talking to you,’ and he said ‘Just so you don’t say nothing to me about it,’ so Horne said ‘Well I wasn’t talking to you, but it will go for you if you want to take it up,’ and at that time he jumped up and he grabbed Horne, and was pulling Horne over the table, and I see Horne went into — into his pocket, and I run back of the table then and the gun fired.
*656 “Q. And who had the gun? A. Horne, I reckon.
“Q. This man here? A. Yes.
“Q. And where were you when the gun fired? A. I was in the kitchen right side of the room, not fur from the table where they was.”
Just a few minutes prior to Horne’s arriving at Harris’ home, the deceased, Watts, had arrived coming from the direction of Ella Mae Williams’ house. Ella Mae testified that on the afternoon in question Watts had been drinking; that he threatened her husband in regard to repayment of a $2 loan which had been made sometime ago; and then she summarized Watts’ altercation with her husband thusly:
“Q. Just tell us what happened on that afternoon. A. On that afternoon? Well he kept giving his hand toward my husband, he asked my husband did he want him to let the barrel he was holding go off on him, he just kept cocking his finger like that, so my husband he say ‘No,’ he wouldn’t fall out about $2.00, so he say ‘Yeah, I never get too damn drunk not to know when a nigger pay me my damn money,’ that’s what he said, so I told my husband, I said ‘Let’s go over to Carrie’s and Bill’s, because this man is looking for trouble, and so I told him he’d have to leave because we was fixin’ to go out, and when he hit the bottom step on the ground, he told my husband, he say ‘Remember, if you ever meet me again, and don’t have my $2.00’ he say ‘if you see me before I see you’ he say ‘you better hide yourself, because — ”
The State objected to further testimony about what transpired between the deceased and the third party prior to the incident in issue, which objection was sustained by the court.
There was testimony that the defendant had worked for a Mr. Hayner for about nine years collecting rents for him and often had as much as $300 on his person and for that reason carried a pistol in his pocket. There was further testimony that this particular section of the Negro area was a troublesome section but that the defendant had never experienced any trouble in the past nor had he ever been short in his rent collections.
The defendant testified that when the deceased grabbed him, he started to get up and leave the table and get out of the house because he thought the victim “was trying to catch me, he did catch me before I could get up out of the chair.” The defendant also stated that when the victim grabbed the defendant with his left hand the victim had his right hand in his pocket “or in that area.”
The appellant states the following questions in his brief:
1. “Did the Court err in rejecting testimony which would tend to show the disposition and state of mind of Moses Watts, the deceased, just prior to the encounter with the defendant?”
2. “Was the evidence sufficient to sustain the verdict ?”
The record contains no evidence that the defendant knew of Watts’ prior altercation with Ella Mae Williams and her husband.
Cases admitting testimony concerning prior threats by the victim to the accused are not applicable. The general rule is stated in 40 C.J.S. Homicide § 210, at page 1119, wherein it is stated:
“* * * Evidence of prior difficulties between the victim and a third person * * * are inadmissible where not properly connected with the offense for which the accused is being tried * * * ”
This principle coupled with the fact that the defendant testified that he did not know the victim nor was he afraid of the victim until the altercation physically began, would appear to justify excluding the obj ected to testimony.
*657 In passing, it should be noted that in proving a violent and dangerous character evidence must be shown by testimony of his general reputation in the community and not by specific acts of general bad conduct. See Palm v. State, 135 Fla. 258, 184 So. 881.
The defendant was charged with and convicted of murder in the second degree which is defined in Florida Statutes, Section 782.04, F.S.A., as follows:
“When perpetrated by any act imminently dangerous to another, and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, it shall be murder in the second degree, and shall be punished by imprisonment in the state prison for life, or for any number of years not less than twenty years.”
The defendant, in his brief, argues that if any crime was proven, it was manslaughter instead of murder in the second degree. In Olds v. State, 44 Fla. 452, 33 So. 296, 299, the court stated in distinguishing between the crimes of murder and manslaughter :
“* * * a killing in sudden passion, excited by sufficient provocation, without malice, is manslaughter, not because the law supposes that this passion made him (the slayer) unconscious of what he was about to do, and stripped the act of killing of an intent to commit it, but because it presumes that passion disturbed the sway of reason, and made him regardless of her admonitions. * * * ”
The Court then referréd to the case of Holland v. State, 12 Fla. 117, wherein was held that certain conditions must exist before a given homicide could be considered manslaughter rather than murder. In essence the Court held that malice, either express or implied, which is the very essence of murder-is presumed to be absent upon a showing by the accused that the provocation upon which he acted was such as would ordinarily excite a reasonable man to violent anger, and cause him to lose control of his passion. Thus passion without reasonable provocation, or provocation without passion, is not a sufficient showing by the defendant; and even when there is both passion and provocation, the provocation must be reasonable and sufficient to entitle the accused to this humane interpretation of the law.
We note that in 9 Fla.Jur. 210, Criminal Law, Section 181, the author of the text-states :
“ * * * If through carelessness or fright, or undue excitement, he takes the life of another when it is not necessary and when there is no reasonable ground to believe that it is necessary, he is not excused. Such an emotional state may go in mitigation of the offense and may reduce the grade of the crime, but furnishes no complete justification or excuse for the taking of life.”
In determining what is contemplated by the term “evincing a depraved mind regardless of human life” and whether this contemplates a requisite of malice to sustain a verdict of murder in the second degree, the Supreme Court stated in Huntley v. State, Fla. 1953, 66 So.2d 504, 507:
“Whatever view is taken of the testimony in the record, there is no question that it reflects on the part of the appellants a situation ‘evincing a depraved mind regardless of human life.’ These words were never meant to be used in a strict technical sense and is well stated by this Court in Ramsey v. State, 114 Fla. 766, 154 So. 855, 856: Tt is obvious, therefore, that the phrase “evincing a depraved mind regardless of human life,” as used in the statute [F.S.A. § 782.04] denouncing murder in the second degree, was-not used in the legal or technical sense of the word “malice” as above defined. *658 The phrase conveys the idea of “malice” in the popular or commonly understood sense of ill will, hatred, spite, an (sic) evil intent. It is the malice of the evil motive which the statute makes an ingredient of the crime of murder in the second degree. See Davis v. Hearst, 160 Cal. 143, 116 P. 530.’ ”
The lower court in the instant case thoroughly instructed the jury in the elements of murder in the second degree as well as the lesser included offense of manslaughter stating as to manslaughter:
“ * * * The killing of a human being by the act, procurement, or culpable negligence of another in cases where such killing shall not be justifiable or excusable homicide, nor murder, according to the provisions of this article, shall be deemed Manslaughter, and shall be punished as prescribed by the laws of this State. Intent is not an element of Manslaughter and need not be proven.”
The court also charged in detail on self-defense.
This court has studied the record and particularly the evidence in this case to see whether the court should remand the case to the lower court for judgment and sentence of manslaughter instead of second-degree murder, but conclude that it was in the province of the jury, under the evidence in this case, to determine which of the crimes the defendant was guilty and since the jury brought in a verdict of murder in the second degree, we are of the opinion that there was sufficient evidence, if believed, to justify the jury verdict.
The appellant contended in the lower court and strenuously argues on appeal that his conduct was in self-defense. This issue was properly submitted to the jury accompanied by adequate instructions thereon by the court, and the jury having determined this issue adversely to the defendant, we can find no reason to set aside the jury’s findings. There is no evidence in the record that the deceased had threatened the appellant nor that the appellant was afraid of deceased or knew anything of the deceased’s disposition which would give appellant a reasonable apprehension that his life was in immediate danger. In Ammons v. State, 88 Fla. 444, 102 So. 642, it was held that if through carelessness or fright, or undue excitement, a- person takes the life of another when it is not necessary and when there is no reasonable ground to believe that it is necessary, he is not excused nor can he claim justification for the taking of another’s life. See also O’Steen v. State, 92 Fla. 1062, 111 So. 725.
Finding no error in the record and for the reasons assigned herein, the lower court should be and is affirmed.
Affirmed.
KANNER and SHANNON, JJ., concur.